IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HARPER, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 07 CV 2393 |
| -vs- | ) | |
| | ) | *(Judge Darrah)* |
| SHERIFF OF COOK COUNTY | ) | |
| and COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| *Defendants.* | ) | |

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

## I.  INTRODUCTION

Plaintiff brings this action to challenge a particularly obnoxious policy which the Sheriff of Cook County applies to persons arriving at the Criminal Courts Building following a warrantless arrest when, after a judge has set bond, the arrestee's family is seeking to post bond.

If the arrestee is a person of wealth, clout, or political influence, he (or she) is placed in a holding area while the bond papers are prepared,

The holding area is not available for arrestees like plaintiff, who lacks wealth, clout and political influence.  (Complaint, par. 8.)  The Sheriff requires that "ordinary people" whose family is seeking to post bond be held with the arrestees who, because they are unable to post bond, are being processed into the jail.

Processing is not a pleasant experience.  It begins with several hours of detention in an unsanitary animal cage, followed by a mandatory chest x-ray and the mandatory taking of blood.  (Complaint, par. 7.)  Before January 26, 2007,

the process also, for male arrestees, included the insertion of a swab into the urethra for STD testing.  The coup de grace of processing is a strip search conducted in a manner calculated to embarrass and humiliate.  Id.

This "processing" involves unreasonable searches and seizures (the strip search, the swab test, and the blood test), and unconsented to medical procedures (the mandatory chest x-ray), as well as arbitrary treatment violative of the Equal Protection Clause of the Fourteenth Amendment (the special treatment for persons with clout).  Plaintiff, who seeks to maintain this action for himself and others similarly situated under Rule 23(b)(3) of the Federal Rules of Civil Procedure, contends that this treatment of arrestees who are "ready, willing, and able to post cash bond" (Complaint, par. 8), is contrary to rights secured by the Fourth and Fourteenth Amendments:

Defendants have moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  As most recently summarized by the Seventh Circuit:

> Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted.  To state such a claim, the complaint need only contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a)(2).  The Supreme Court has interpreted that language to impose two easy-to-clear hurdles.  First, the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* ___ U.S. ___, ___, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99 (1957)) (alteration in *Bell Atlantic*).  Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff pleads itself out of court. *Bell Atlantic,* 127 S.Ct. at 1965, 1973 n. 14.

*EEOC v. Concentra Health Services, Inc.,* ___ F.3d ___, ___ (7th Cir., No. 06-3436, August 3, 2007, slip op. 5.) (attached as Exhibit 1)

Defendants offer only a terse argument about the lack of detail in the complaint (Def.Mem. 12), and instead seek to use their 12(b)(6) motion to raise affirmative defenses and to argue that plaintiff's claims are barred by res judicata because of the pendency of two class actions. (Def.Mem. 4-6.) Plaintiff shows in Part I of this memorandum that the complaint meets the pleading standard of Rule 8 of the Federal Rules of Civil Procedure and shows in Part II that the policy at issue in this case is not raised in either of the two pending class actions on which defendants rely.

Defendants also rely on a mistaken view of res judicata in their meritless argument that plaintiff is "barred by res judicata, or claim preclusion, from bringing a separate action as a class representative on the same facts." (Def.Mem. 5.) Plaintiff shows in Part III of this memorandum that the affirmative defense of res judicata cannot be raised on a Rule 12(b)(6) motion to dismiss. Moreover, as plaintiff shows in Part IV, an essential element of the affirmative defense is a final judgment, which has not been entered in either of the two class actions.

In addition to these errors of fact and law, defendants advance a variety of factual arguments in support of the constitutionality of requiring persons who are seeking to post bond to submit to a chest x-ray and the drawing of blood. (Def.Mem. 7-12.) These arguments, while insubstantial, may not be raised on a Rule 12(b)(6) motion to dismiss and, as plaintiff shows in Part V, should be rejected by the Court.

## II.  THE COMPLAINT SATISFIES THE PLEADING STANDARD OF RULE 8 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendant assert that the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly,* ___ U.S. ___, 127 S.Ct. 1955 (2007) requires that a plaintiff "must plead more than mere legal and factual allegations unsupported by facts." (Def.Mem. 12.)   The Seventh Circuit rejected this argument in *EEOC v. Concentra Health Services, Inc.,* ___ F.3d ___, ___ (7th Cir., No. 06-3436, August 3, 2007) (attached as Exhibit 1).

In *Concentra,* the Seventh Circuit held that "*Bell Atlantic* left our notice pleading jurisprudence intact."   *Concentra, supra,* slip op. 19 (Flaum J., dissenting).  This standard, as summarized in *Concentra,* is as follows:

> Rule 8(a)(2)'s short and plain statement of the claim must contain a minimal level of factual detail, although that level is indeed very minimal. *See Bell Atlantic,* 127 S.Ct. at 1964-65 & n. 3 (2007). The classic verbal formula is that a complaint need only be sufficiently detailed to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.  Id. at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99 (1957)) (alteration in *Bell Atlantic*); *Cler v. Ill. Educ. Ass'n,* 423 F.3d 726, 729 (7th Cir. 2005).  This formula captures a mood of liberal pleading that is enough to settle the sufficiency of most federal complaints, but it isn't anything that we can use with any precision. Charles E. Clark, *Pleading Under the Federal Rules,* 12 Wyo. L.J. 177, 181 (1957-1958).  "[T]o determine exactly what is enough  in a rare close case, a court must attend closely to the purpose of the federal pleading rules and the guidance offered by prior decisions."  *McCormick v. City of Chicago,* 230 F.3d 319, 323-26 (7th Cir. 2000).  (footnotes omitted)

> As the EEOC asserts, "[t]he intent of the liberal notice pleading system is to ensure that claims are determined on their merits rather than through missteps in pleading."  2 James W. Moore, et al., *Moore's Federal Practice* §8.04 (3d ed. 2006); see also *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002); *Connor v. Ill. Dep't of Natural Res.,* 413 F.3d 675, 679 (7th Cir. 2005).  Requiring a plaintiff to plead detailed facts interferes with that goal in multiple ways.  First, and most importantly, the number of factual details potentially relevant to any case is astronomical, and

requiring a plaintiff to plead facts that are not obviously important and easy to catalogue would result in needless controversies about what is required that could serve only to delay or prevent trial. Charles E. Clark, *Special Pleading in the Big Case,* 21 F.R.D. 45, 53 (1957); see also *Luckett v. Rent-A-Center, Inc.,* 53 F.3d 871, 873 (7th Cir. 1995) (warning that the pleading stage is not the occasion for technicalities). Most details are more efficiently learned through the flexible discovery process. *Swierkiewicz,* 534 U.S. at 512-13; *Walker v. Benjamin,* 293 F.3d 1030, 1039 (7th Cir. 2002). Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving. *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir. 1998); *see also Dioguardi v. Durning,* 139 F.2d 774, 775 (2d Cir. 1944) (describing attempts to force all facts into the complaint as judicial haste which in the long run makes waste). Second, a plaintiff might sometimes have a right to relief without knowing every factual detail supporting its right; requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim. *Am. Nurses' Ass'n v. State of Illinois,* 783 F.2d 716, 723 (7th Cir. 1986); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384, 404 (7th Cir. 1984),*aff'd,* 473 U.S. 606 (1985).

*EEOC v. Concentra Health Services, Inc.,* ___ F.3d ___, ___ (7th Cir., No. 06-3436, August 3, 2007, slip op. 9-1_) (attached as Exhibit 1).

Plaintiff begins his complaint by explaining the factual background for his claims:

4   On or about September 30, 2005, plaintiff Robert Harper was taken to the Criminal Courts Building at 2650 South California Avenue following his arrest without a warrant by a Chicago police officer.

5   At the criminal courts building, plaintiff appeared by remote viewing ("TV court"), before a judge who set bond and ordered that plaintiff be held in the custody of defendant Sheriff pending the posting of bond.

6   Members of plaintiff's family attended the bond hearing and immediately sought to post cash bond to obtain plaintiff's enlargement from custody.

Plaintiff then identifies the official policies which are at issue in this case:

First, plaintiff challenges his "placement into an overcrowded and unsanitary animal cage," followed by "a chest x-ray, the non-consensual insertion of a swab into plaintiff's penis, the non-consensual taking of blood, and a strip search which was conducted in a manner calculated to embarrass and humiliate." (Complaint, par. 7.)

Second, plaintiff complains about the denial of Equal Protection resulting from "the practice of the Sheriff of Cook County to excuse from this processing persons of wealth, clout, or political influence who, after bond has been set at "TV court," are ready, willing, and able to post cash bond."  (Complaint, par. 8.)

Plaintiff also identifies how he was injured by these official policies in paragraph 9:

> 9   As the direct and proximate result of the above referred policy, plaintiff, and all others persons subjected to the above referred policy, was embarrassed, humiliated, unreasonably deprived of his liberty, incurred pain and suffering, and was deprived of rights secured by the Fourth and Fourteenth Amendments.

Plaintiff's complaint fully complies with the notice pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure.  The Court should reject defendants' arguments to the contrary.

## III.  REQUIRING ARRESTEES WHO LACK CLOUT TO SUBMIT TO "PROCESSING" BEFORE POSTING BOND IS NOT AT ISSUE IN EITHER *JACKSON* OR YOUNG

Requiring arrestees who lack clout to submit to "processing" before posting bond is not at issue in either *Jackson v. Sheriff,* 06 C 493 or *Young v. County of Cook,* 6 C 552.

The *Jackson* case involves male prisoners who were subjected to "the non-consensual insertion of a swab into his penis *as part of his admission to the jail.*" (Def.Mem. 4, citing the *Jackson* class certification order, emphasis added.)  Plaintiff was not "admitted to the jail," but was held in custody for several hours while his family sought to post bond.  As Judge Coar recognized in his order denying cross-motions for summary judgment in *Jackson,* because "of the leeway given prison administrators who are ostensibly working to support the health of the population under their charge," the Constitution might well permit the Sheriff to require the STD testing of all persons who will be held at the jail.  *Jackson v. Sheriff of Cook County,* No. 06 C 493, Memorandum Opinion, March 23, 2007, 15 (Exhibit 2, attached).

Plaintiff, however, was not being held at the jail: he was in the Sheriff's custody only for as long as it took the Sheriff's clerks to receive the cash bail that plaintiff's family was seeking to post.  There was no conceivable reason to subject plaintiff to an STD test during this brief interval.

The *Young* case is also quite different from this case.  The plaintiffs in *Young* are "new detainees at the Cook County Jail" who challenge the manner in which they were strip searched.  (Def.Mem. 5, citing the *Young* class certification order.)  Notwithstanding defendants' use of the word "certainly," (Def.Mem. 5), plaintiff was never a "detainee at the Cook County Jail."  Plaintiff was an arrestee, who was brought to the Criminal Court Building for the setting of bond, and who was briefly held in the Sheriff's custody while plaintiff's

family posted cash bond.

The question of whether the Sheriff may strip search persons like plaintiff who are being briefly held in the Sheriff's custody while cash bond is posted is quite different from the questions at issue in *Young* concerning the manner in which the Sheriff searches new detainees at the jail. Plaintiff's claims are not at issue in *Young* and will not be resolved in that case.

Nothing in either *Jackson* or *Young* speaks to the equal protection problem presented in this case when the Sheriff provides special treatment to persons of wealth, clout, or political influence and allows those persons to post bond without being subjected to processing. (Complaint. par. 8.) The Court should reject the Sheriff's factual argument that the policy challenged in this case is already at issue in other litigation. Plaintiff shows below that the Court should also reject the Sheriff's legal argument on this claim.

## IV.  DEFENDANTS MAY NOT RAISE THEIR MERITLESS AFFIR-MATIVE DEFENSE ON A RULE 12(b)(6) MOTION TO DISMISS

Defendants are in error in asserting that the affirmative defense of res judicata may be raised on a Rule 12(b)(6) motion to dismiss.

The general rule is that "it is incorrect to grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense." *McCready v. eBay, Inc.,* 453 F.3d 882, 892 n.2 (7th Cir. 2006). The only exception to this rule is when the plaintiff pleads himself out of court by "admit[ting] all of the ingredients of an impenetrable defense." *Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004).

Plaintiff's complaint does not admit any of the three elements of res judicata: "(1) a final judgment on the merits in an earlier action, (2) an identity of

the cause of action in both the earlier and later suit, and (3) an identity of parties or privies in the two suits." *Smith v. City of Chicago,* 820 F.2d 916, 917 (7th Cir. 1987) Such an admission, of course, would be impossible because there has not as yet been entry of a final judgment in either *Jackson* or *Young.* See Part V below.

Defendants are mistaken in their claim that the Sixth Circuit held in *Abbott v. Michigan,* 474 F.3d 324 (6th Cir. 2007) that a res judicata defense may be raised on a Rule 12(b)(6) motion to dismiss.  (Def.Mem. 5.)  A careful reading of *Abbott* reveals that the motion to dismiss in that case had been treated as a motion for summary judgment.  474 F.3d at 331 n.8.

Defendants are likewise in error in their reliance on *Martin v. Davies,* 917 F.2d 336 (7th Cir. 1990), and on the *Duran* consent decree concerning conditions at the Cook County Jail.  Contrary to defendants' claims, the Seventh Circuit made plain in *Martin* that "[t]the *Duran* decree does not address damage claims." Id. at 340.  Thus, the Court held in *Martin* that "dismissal of [damage] claims because they were governed by *Duran* was erroneous."  Id.

Defendants' invocation of res judicata in the present case is particularly inappropriate because of the absence of a final judgment in *Jackson* and *Young.*

## V.  RES JUDICATA REQUIRES A FINAL JUDGMENT

An essential element of res judicata defense is "a final judgment on the merits."  *Allen v. McCurry,* 449 U.S. 90, 94 (1980); *Tartt v. Northwestern Community Hospital,* 453 F.3d 817, 833 (7th Cir. 2006).  This element is missing from both *Jackson* and *Young.*

There is not yet a final judgment in *Jackson v. Sheriff,* 06 C 493. The district court has given preliminary approval to a proposed class action settlement

and the case is set for a fairness hearing on October 31, 2007.  (*Jackson v. Sheriff,* No. 06 C 493, Order, July 17, 2007, attached as Exhibit 3.)

Nor is there a final judgment in *Young v. County of Cook,* No. 06 C 662. There, the parties have until March 7, 2008 to complete pre-trial discovery. (*Young v. County of Cook,* No. 06 C 662, Order, May 10, 2007, attached as Plaintiff's Exhibit 4.)

Defendant's res judicata argument flunks the "final judgment" test required for a res judicata defense and should be rejected.

## VI.  DEFENDANTS' INSUBSTANTIAL FACTUAL ARGUMENTS ARE NOT PROPERLY RAISED ON A RULE 12(B)(6) MOTION TO DISMISS

In addition to its meritless res judicata argument, defendants argue that there is no constitutional infirmity in extracting blood from persons who are temporarily in custody while family members post bond.  (Def.Mem. 7-9.)  In the same vein, defendant offers a variety of factual arguments to justify its policy of requiring chest x-rays of persons who are temporarily in custody while family members post bond.  (Def.Mem. 9-11.)

Similar arguments were presented on cross motions for summary judgment in *Jackson v. Sheriff of Cook County,* No. 06 C 493.  There, after the parties had completed discovery and submitted the elaborate submissions required by Local Rule 56, Judge Coar concluded that the factual disputes could not be resolved without a trial.  *Jackson v. Sheriff of Cook County,* No. 06 C 493, Memorandum Opinion, March 23, 2007, 15 (Exhibit 2, attached).

Defendants in this case, — the same defendants in *Jackson* — ask this Court to resolve factual issues as a matter of law, without any evidentiary record.  (Def.Mem. 8-12.)  The Court should reject this outrageous request.

## VII.  CONCLUSION

For the reasons above stated, the Court should deny defendants' motion to dismiss.

*/s/ Kenneth N. Flaxman*

_____

KENNETH N. FLAXMAN
ARDC No. 830399
200 South Michigan Avenue
Suite 1240
Chicago, Illinois 60604-2430

(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)


THOMAS G. MORRISSEY
10249 South Western Avenue
Chicago, Illinois 60643

(773) 233-7900 (phone)
(773) 239-0387 (fax)
tgmlaw@ameritech.net

*attorneys for plaintiff*

**Exhibit 1**

In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 06-3436

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellant,*

*v.*

CONCENTRA HEALTH SERVICES, INCORPORATED,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northen District of Illinois, Eastern Division.
No. 05 C 1109—**Wayne R. Andersen**, *Judge.*

———————

ARGUED MAY 25, 2007—DECIDED AUGUST 3, 2007

———————

Before BAUER, CUDAHY and FLAUM, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Charles Horn complained to the Equal Employment Opportunity Commission that his employer, Concentra Health Services, Inc., fired him when he reported a sexual affair between his supervisor and another employee. The EEOC brought an action against Concentra, arguing that Concentra had violated the anti-retaliation provision of Title VII of the Civil Rights Act of 1964. The district court dismissed the EEOC's complaint without prejudice, holding that the anti-retaliation provision did not protect Horn's report. The EEOC responded by filing a markedly less detailed

amended complaint that did not allege the specifics of
Horn's report. The district court dismissed the amended
complaint with prejudice. The EEOC appeals and we
affirm, holding that the amended complaint failed to
provide Concentra with sufficient notice of the nature of
the EEOC's claim.

## I. Background

In 2003, Charles Horn filed a charge of discrimination
with the Equal Employment Opportunity Commission
(EEOC). In it he alleged that, while working as an Assis-
tant Center Administrator for Concentra Health Services,
Inc. (Concentra) in August 2001, he discovered that his
supervisor and another employee were having a sexual
affair. In April 2002 Horn further learned that the supervi-
sor was giving the employee preferential treatment
because of this relationship. The charge stated that on
April 25, 2002, Horn reported the situation to Concentra's
brass. Concentra allegedly responded by, among other
things, firing Horn on a pretext.

The EEOC investigated Horn's charge and sued
Concentra under Title VII of the Civil Rights Act of 1964,
using its power to "bring a civil action against any respon-
dent . . . named in the charge." 42 U.S.C. § 2000e-5(f)(1).
Its terse complaint alleged that Concentra had retaliated
against Horn because he "opposed [a] practice made an
unlawful employment practice" by Title VII, in violation of
42 U.S.C. § 2000e-3(a). The complaint also laid out the
broad details alleged in Horn's charge: Horn reported to
Concentra's Director of Human Resources that "his female
supervisor gave a male subordinate, with whom she was
having an inappropriate sexual relationship, preferential
treatment over similarly situated employees with respect
to his employment," and Concentra responded by firing
Horn. (Compl. ¶ 7.)

The district court granted Concentra's motion to dismiss the complaint for failure to state a claim upon which relief can be granted. It reasoned that employees are protected against retaliation only when they reasonably believe that the activities they oppose violate Title VII, *see Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269-71 (2001) (per curiam); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000), and that it was clear at the time Horn reported the affair that favoring a subordinate because of a sexual relationship did not, without more, violate Title VII, *see Preston v. Wis. Health Fund*, 397 F.3d 539, 541 (7th Cir. 2005); *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002). The court concluded that, assuming Horn had believed that the affair violated Title VII, his belief was not reasonable, and that the EEOC's complaint therefore did not state a claim of illegal retaliation. *EEOC v. Concentra Health Servs., Inc.*, No. 05 C 1109, 2005 WL 2989904, *2 (N.D. Ill. Nov. 3, 2005).

The dismissal was without prejudice and rather than stand on its complaint and challenge the district court's interpretation of Title VII, the EEOC chose to file an amended complaint that is the subject of this appeal. It differs from the original in only one respect: the seventh paragraph, which sets forth the EEOC's claim, is conspicuously less detailed and specific.

> Since at least 2001, Defendant has engaged in unlawful employment practices at its Elk Grove location, in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). Such unlawful employment practices include, but are not limited to, retaliating against Horn after he opposed conduct in the workplace that he objectively and reasonably believed in good faith violated Title VII by reporting the conduct to Concentra's Director of Human Resources. Concentra's

retaliation includes, but is not limited to, issuing Horn unwarranted negative evaluations and terminating him.

(Am. Compl. ¶ 7.) Thus, the amended complaint does not specify the nature of the conduct Horn reported to the Human Resources Director other than to indicate that Horn reasonably believed that it violated Title VII.

Concentra again moved to dismiss. The district court, noting that the "amended complaint is even more vague than the original," *EEOC v. Concentra Health Servs., Inc.*, No. 05 C 1109, 2006 WL 2024240, *1 (N.D. Ill. July 12, 2006), granted the motion with prejudice, offering two alternative and radically different (indeed logically inconsistent) bases for its decision. First, it concluded that the complaint did not provide sufficient notice of the nature of the EEOC's claim "because it offers only a conclusory allegation rather than offering any facts to support the claim," and more specifically because it does not "specify what conduct Horn believed to violate Title VII." *Id.* at *2. Second, it concluded that Horn's EEOC charge is "central to [the EEOC's] claim" (in that a charge is a statutory prerequisite to the EEOC's suit) and consequently should be considered part of the complaint, even though it was not physically attached to the complaint. *Id.* at *3. The court reasoned that because the amended complaint refers to the charge, the EEOC must adopt all of the charge's allegations and plead itself out of court again. *Id.* at *4-7. The EEOC now appeals.

## II. Discussion

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted that language to impose two easy-to-clear hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in *Bell Atlantic*). Second, its allegations must plausibly suggest that the defendant has a right to relief, raising that possibility above a "speculative level"; if they do not, the plaintiff pleads itself out of court. *Bell Atlantic*, 127 S. Ct. at 1965, 1973 n.14. Concentra argues in the alternative that the EEOC's complaint has failed to meet either of these requirements; we discuss the latter first.

## A.  Did the EEOC Plead Itself Out of Court?

One reason Concentra offers for affirming the dismissal of the EEOC's amended complaint is that the EEOC has pleaded itself out of court by alleging that Horn reported his supervisor's favoritism to a lover. This argument reflects a fond nostalgia for the EEOC's original complaint, which alleged those facts and was dismissed because the allegations neither constituted a violation of Title VII nor "suggest[ed]" such a violation. *EEOC v. Concentra Health Servs., Inc.*, 2005 WL 2024240, *5 (N.D. Ill. July 12, 2006). That original dismissal was probably correct. True, while the original complaint stressed the rejected "favoring a paramour" theory, it did not logically foreclose the possibility that some other aspect of Horn's report might have furnished a ground for relief. Perhaps, as Concentra now suggests, the reported affair was not consensual but rather the result of quid-pro-quo sexual harassment. Some of our cases suggest that such a possibility is enough to avoid dismissal. *See, e.g.*, *Kolupa v. Roselle Park Dist.*, 438

F.3d 713, 715 (7th Cir. 2006) (stating that dismissal is proper only "when it would be necessary to contradict the complaint in order to prevail on the merits").

Those cases, however, are no longer valid in light of the Supreme Court's recent rejection of the famous remark in *Conley v. Gibson* from which they derive, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic,* 127 S. Ct. at 1968 (*quoting Conley v. Gibson,* 355 U.S. at 45-46). As the *Bell Atlantic* Court explained, it is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief, *id.* at 1968-69, by providing allegations that "raise a right to relief above the speculative level," *id.* at 1965. Horn's report of a sexual affair is logically consistent with the possibility that the affair was caused by quid-pro-quo sexual harassment, but it does not *suggest* that possibility any more than money changing hands suggests robbery. Dismissal was probably correct.

But enough of this trip down memory lane; why are allegations contained in the original complaint relevant to this appeal? The original complaint was dismissed and the EEOC does not seek to resurrect it. The amended complaint does not contain the specifics of Horn's report, which the EEOC undoubtedly excluded precisely to avoid pleading itself out of court. Concentra does not contend that the bare allegations of the amended complaint's seventh paragraph fail to plausibly suggest a right to relief.[1] Neither does it argue that the EEOC is still bound

---

[1] Concentra probably avoids this contention with good reason. That Concentra might retaliate against Horn for a report

(continued...)

by the allegations of its original complaint, which it is not. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002); *Nisbet v. Van Tuyl*, 224 F.2d 66, 71 (7th Cir. 1958).

Concentra does argue that the EEOC is bound by Horn's EEOC charge. The EEOC did not attach the charge to its complaint, which would have made the charge part of the pleadings under Fed. R. Civ. P. 10(c), but Concentra relies on a "narrow exception" to Rule 10(c) holding that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 731 n.3 (7th Cir. 2005); *188 LLC*, 300 F.3d at 735. The amended complaint refers to the charge because it satisfies a statutory prerequisite to the EEOC's suit, since the EEOC can sue only a

---

[1]  (...continued)
protected by Title VII seems no less plausible than that a prison doctor might improperly withhold desperately needed medication, see *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam), or that a driver might negligently strike a pedestrian, *see* Fed. R. Civ. P. Form 9; *see also* Fed. R. Civ. P. 44 (stating that the forms "are sufficient under the rules"). *Bell Atlantic* itself does not appear to suggest that the *bare idea* of an antitrust conspiracy among major telephone companies like the one alleged in that case is implausible; rather, it appears to hold that the plaintiffs pleaded themselves out of court with detailed "allegations of parallel conduct" that did not plausibly suggest such a conspiracy. *Bell Atlantic*, 127 S. Ct. at 1963, 1966. The Court did not decide whether the complaint would have been dismissed "had [it] not explained that the claim of agreement rested on the parallel conduct described." *Id.* at 1970 n.10. The Court suggested that it might have been dismissed, but because it "would [not] have given the notice required by Rule 8," not because its allegations would have been implausible. *Id.*; *see also id.* at 1966 & n.5 (stressing that adequate notice and plausibility are two distinct, parallel requirements ).

"respondent . . . named in [a] charge," 42 U.S.C. § 2000e-5(f)(1), and Concentra contends that the charge is "central" to the EEOC's claim for that same reason. Because the charge contains allegations similar to those of the original complaint, Concentra concludes, the EEOC has foolishly pleaded itself out of court again, despite its plain desire to avoid doing just that.

Concentra's argument does not work because while the defendant the EEOC sues must be named as a respondent in a charge, the facts it seeks to prove need not be listed there. The charge triggers the investigation, but "if the investigation turns up additional violations, the [EEOC] can add them to its suit"; there is no need for the EEOC's complaint to be "closely related to the charge." *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005). Given that flexibility, the charge need not be "central" to the complaint, and consequently need not be considered part of it. *See Levenstein v. Slafsky*, 164 F.3d 345, 347 (7th Cir. 1998) ("[T]his is a narrow exception aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment.").

Moreover, even if the EEOC had attached the charge to its amended complaint, it would have adopted its allegations only if it relied on the charge to form the basis of its claims. *Carol v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004); *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455-56 (7th Cir. 1998). Plaintiffs often attach documents to complaints for other reasons entirely. For instance, a plaintiff challenging an administrative action might attach a copy of the administrator's decision to its complaint in order to illustrate the action it attacks, but it would not by doing so adopt all of the administrator's assertions as its own (indeed, quite the contrary). *Carol,* 362 F.3d at 986. In the present case, the EEOC similarly referred to Horn's charge not to catalogue the facts it

hoped to prove at trial, but only to show that "[a]ll conditions precedent to the institution of this lawsuit have been fulfilled," in other words, that a charge naming Concentra as respondent had been filed. (Am. Compl. ¶ 6.) The EEOC's considerate decision to include this fact in its complaint did not compel it to adopt the charge's statements as its own and thereby plead itself out of court.

## B. Did the EEOC Provide Fair Notice of Its Claims?

This leaves the second ground on which Concentra urges us to affirm the dismissal of the complaint: that it fails to specify the conduct that Horn reported to the Director of Human Resources (except, of course, to say that Horn reasonably believed it violated Title VII). Rule 8(a)(2)'s "short and plain statement of the claim" must contain a minimal level of factual detail, although that level is indeed very minimal. S*ee Bell Atlantic*, 127 S. Ct. 1964-65 & n.3 (2007). The classic verbal formula is that a complaint need only be sufficiently detailed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 1964 (*quoting Conley v. Gibson,* 355 U.S. 41, 47 (1957)) (alteration in *Bell Atlantic*); *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005).[2] This formula captures a mood of liberal pleading that is enough to settle the sufficiency of most federal complaints, but "it isn't anything that we can use with any precision." Charles E. Clark, *Pleading Under the*

---

[2]  We have sometimes used other formulas, stating, for instance, that complaints must give defendants "a reasonable opportunity to form an answer," *Pratt v. Tarr*, 464 F.3d 730, 732 (7th Cir. 2006), and enable defendants to "begin to prepare their defense," *id.* at 733.

*Federal Rules*, 12 Wyo. L.J. 177, 181 (1957-1958).[3] "[T]o determine exactly what is 'enough'" in a rare close case, a court must attend closely to the purpose of the federal pleading rules and the guidance offered by prior decisions. *McCormick v. City of Chicago*, 230 F.3d 319, 323-26 (7th Cir. 2000).

As the EEOC asserts, "[t]he intent of the liberal notice pleading system is to ensure that claims are determined on their merits rather than through missteps in pleading." 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed. 2006); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002); *Connor v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 679 (7th Cir. 2005). Requiring a plaintiff to plead detailed facts interferes with that goal in multiple ways. First, and most importantly, the number of factual details potentially relevant to any case is astronomical, and requiring a plaintiff to plead facts that are not obviously important and easy to catalogue would result in "needless controversies" about what is required that could serve only to delay or prevent trial. Charles E. Clark,

---

[3] Requiring an opportunity to form an answer or to begin to prepare a defense might sound more like an easy-to-apply yardstick until one realizes that neither standard can be taken literally. Rule 8(b) would permit any defendant to answer even the most vacuous and vague complaints truthfully and without prejudice to its defense by answering that it is "without knowledge or information sufficient to form a belief as to the truth of [its] averments," rendering Rule 8(a)(2) empty. Similarly, a defendant can always begin to investigate and prepare a defense by serving a contention interrogatory on the plaintiff in discovery. *Pratt v. Tarr*, 464 F.3d 730, 733 (7th Cir. 2006); *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999). What our cases require, however, is that a defendant know some quantum of information about the plaintiff's claim before discovery starts. The question that must be resolved in close cases is how much information is required.

*Special Pleading in the "Big Case,"* 21 F.R.D. 45, 53 (1957); *see also Luckett v. Rent-A-Center, Inc.*, 53 F.3d 871, 873 (7th Cir. 1995) (warning that "the pleading stage is not the occasion for technicalities"). Most details are more efficiently learned through the flexible discovery process. *Swierkewicz*, 534 U.S. at 512-13; *Walker v. Benjamin*, 293 F.3d 1030, 1039 (7th Cir. 2002). "Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *see also Dioguardi v. Durning*, 139 F.2d 774, 775 (2d Cir. 1944) (describing the attempts to force all facts into the complaint as "judicial haste which in the long run makes waste"). Second, a plaintiff might sometimes have a right to relief without knowing every factual detail supporting its right; requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim. *Am. Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 723 (7th Cir. 1986); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 404 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985).

But a pleading standard designed to protect litigants and their lawyers from needless, counterproductive technicality is less convincingly invoked by a government agency seeking to simply step around a more informative complaint that has been dismissed for failure to state a claim. The rules do not require unnecessary detail, but neither do they promote vagueness or reward deliberate obfuscation. Judge Charles Clark, the reporter of the committee that drafted Rule 8, once described the need for common sense in pleading standards, asking rhetorically why the federal rules did not eliminate pleadings entirely:

> Why not go to the other extreme and say, "I want you to answer in a tort action," or something like that?

> Well, I think the answer is quite simply that we want
> to get what we can easily get that will be helpful. We
> want the lawyers to "do what comes naturally." . . .
> [W]hat serves as a good form of communication among
> lawyers is desirable here.

Charles E. Clark, *Pleading Under the Federal Rules*, 12
Wyo. L.J. 177, 183 (1957-1958). Encouraging a plaintiff to
plead what few facts can be easily provided and will
clearly be helpful serves to expedite resolution by quickly
alerting the defendant to basic, critical factual allegations
(that is, by providing "fair notice" of the plaintiff's claim)
and, if appropriate, permitting a quick test of the legal
sufficiency of those allegations. *Connor*, 413 F.3d at 679;
*Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860
(7th Cir. 1999).

In the present case the EEOC's lawyers failed to per-
suade the district court that the facts it originally pleaded
stated a claim, so it deleted enough information to disguise
the nature of its claim before the court. This gambit is
not necessarily fatal to a claimant, but such obfuscation
certainly does not intuitively comport with the purposes of
notice pleading. A complaint should contain information
that one *can* provide and that is clearly important; the
EEOC has removed information that it *did* provide and
that showed that its prior allegations did not state a claim.
The one redeeming possibility is that the original com-
plaint contained detail that was not easily provided or
obviously helpful. In general that is not an unlikely
possibility; federal complaints are more often than not
prolix far beyond anything Rule 8 requires. *Jackson v.
Marion County*, 66 F.3d 151, 154 (7th Cir. 1995); *Am.
Nurses' Ass'n*, 783 F.2d at 723-24. But in the present case
the EEOC's original complaint was a model of economy.
The claim itself was set forth in less than a page and the
critical details were contained in a single eight-line

paragraph, the very paragraph targeted for excision in the amended complaint. There was no fat to trim. The EEOC should have been seriously concerned that its amended complaint sliced away the very meat of its claim.

Precedent confirms that a plaintiff like the EEOC alleging illegal retaliation on account of protected conduct must provide some specific description of that conduct beyond the mere fact that it is protected. *Kyle v. Morton High Sch.*, 144 F.3d 448, 454 (7th Cir. 1998). In *Kyle*, a public schoolteacher alleged that he was fired because of his otherwise unspecified "political and advocacy or perceived political and advocacy activities." The district court dismissed and we affirmed, holding that "the complaint for a First Amendment violation must at least put the defendants on notice that some specific speech or conduct by the plaintiff led to the termination." *Id.* at 454. Providing such detail was "not a particularly cumbersome assignment," *id.* at 454, and the information was of obvious critical importance to Kyle's case. It might turn out that the speech Kyle *thought* was protected by the First Amendment was in fact not, a possibility that could be quickly tested if Kyle were to specify the speech in greater detail. *Id.* at 455. Kyle's reticence also frustrated "the defendants' ability to even investigate [his] claim . . . . For example, the Morton School Board cannot ask its board members if they were aware of the speech, conduct or political association engaged in by Kyle—because none is alleged." *Id.* at 455.

Like the *Kyle* complaint, the EEOC's amended complaint fails to provide the notice required by Rule 8(a)(2); it must further specify the "conduct in the workplace" that Horn reported. This is, if anything, a less "cumbersome requirement" than Kyle faced; surely Horn must remember in some detail what he said to the Human Resources Director and must have relayed that information to the

EEOC during its investigation. (Of course, as the EEOC cagily observed at oral argument, there is nothing in the complaint itself to indicate the full extent of what Horn told it, but the EEOC cannot avoid a requirement to provide limited detail simply by failing to provide it and suggesting—not even asserting!—that it cannot do so.)

Further, although the EEOC's amended complaint may not be *quite* as vague as the *Kyle* complaint (it alleges the title of the Concentra official to whom Horn reported the Title VII violation, which at least gives Concentra a place to start investigating what Horn might have said), additional details of Horn's actions are critically important to the case and might facilitate a quick resolution on the merits. Just as Kyle might have misconstrued the scope of First Amendment protection, so the EEOC and Horn may have misconstrued the scope of Title VII. *See, e.g.*, *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704-07 (7th Cir. 2000) (describing a plaintiff that mistakenly thought Title VII prohibited discrimination on account of sexual orientation). Even a description in very general terms ("Horn complained that Concentra denied employees promotions because of their race," "Horn complained that Concentra supervisors were subjecting female employees to a hostile work environment," or some similar phrase) would give Concentra a much clearer idea of the EEOC's claim.

We have stated that a plaintiff alleging employment discrimination on the basis of race, sex or some other factor governed by 42 U.S.C. § 2000e-2 may allege the defendant's intent quite generally: "'I was turned down for a job because of my race' is all a complaint has to say." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *see also Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006) (holding that a religious discrimination plaintiff need only say that the employer "h[eld] the worker's religion against him"). The EEOC argues that its present

complaint is just as informative as these. But we are
unaware of any court that has approved a retaliation
complaint as stripped-down as the EEOC's; one court has
merely suggested, in dicta, that it might. *See Rochon v.
Gonzales*, 438 F.3d 1211, 1200 (D.C. Cir. 2006) (suggesting
that a Title VII retaliation plaintiff need only allege that
the defendant "retaliated against me because I engaged in
protected activity"). It is rarely proper to draw analogies
between complaints alleging different sorts of claims; the
type of facts that must be alleged depend upon the legal
contours of the claim. *Pratt v. Tarr*, 464 F.3d 730, 732 (7th
Cir. 2006); Charles E. Clark, *The Complaint in Code
Pleading*, 35 Yale L.J. 259, 265 (1926). *See also Marshall
v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006) ("The require-
ment that prisoners making access-to-courts claims allege
specific prejudice should not be understood as an onerous
fact-pleading burden; it is simply a requirement that a
prisoner's complaint spell out, in minimal detail, the
connection between the alleged denial of access to legal
materials and an inability to pursue a legitimate challenge
to a conviction."); *Loubser v. Thacker*, 440 F.3d 439, 442-43
(7th Cir. 2006) ("Although conspiracy is not something that
Rule 9(b) . . . requires be proved with particularity . . . it
differs from other claims in having a degree of vagueness
that makes a bare claim of 'conspiracy' wholly uninforma-
tive to the defendant.").

The simple allegation of racial discrimination described
in *Bennett* is factually richer than the empty assertion of
Title VII retaliation here. People have reasonably clear
ideas of how a racially biased person might behave, and a
defendant responding to an allegation of racial bias can
anticipate the sort of evidence that may be brought to
bear and can investigate the claim (by inquiring if any
decision-making employees have a background of making
racially insensitive comments and the like). An allegation
of retaliation for some unspecified act does not narrow the

realm of possibility nearly as much. Further, once a plaintiff alleging illegal discrimination has clarified that it is on the basis of her race, there is no further information that is both easy to provide and of clear critical importance to the claim. Requiring a more detailed complaint in *Bennett* would have replicated the inefficient chase for facts decried in *Bennett* and *Dioguardi*.

But to require a more detailed complaint in the present case is neither to adopt fact pleading nor to impose the heightened pleading required in some instances by Rule 9(b); it is only to insist upon easily provided, clearly important facts. The proper analogue for the present complaint is not a complaint alleging racial discrimination in hiring; it is a complaint in which the plaintiff withholds the basis upon which she suspects her employer acted: "I was turned down for a job for a reason forbidden by Title VII." To permit the EEOC's complaint would reward obfuscation, a perverse result.

Failure to provide fair notice should not normally warrant a dismissal *with prejudice. See Redfield v. Cont'l Cas. Corp.*, 818 F.2d 596, 609-10 (7th Cir. 1987). Rule 8(a)(2) does not seek detail that a plaintiff cannot provide, so a plaintiff should be able to re-plead successfully. But the EEOC has not argued that the district court should have permitted a second amended complaint,[4] so we need

---

[4] We have no way of knowing why the EEOC did not request further repleading, but one cannot help wondering whether the EEOC has any theory on which it hopes to succeed at trial other than the rejected "favoring the paramour" claim. The EEOC has done nothing to explain why, if it has reason to believe there were other bases for retaliation, it left those bases out of its original complaint. Under these circumstances, one can understand why Concentra angrily accuses the EEOC of "hid[ing] the ball" and playing a "shell game." (Br. of Def.-Appellee at 6.) If the

(continued...)

not address that issue. We need only affirm.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

---

4  (...continued)
EEOC is indeed playing such a game, it should be glad that its appeal has failed: discovery might have revealed evidence showing that it merited sanctions for filing a pleading intended "to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed. R. Civ. P. 11(b)(1); *see also Pepper v. Vill. of Oak Park*, 430 F.3d 805, 812 (7th Cir. 2005) (stressing that pleadings serve "to provide notice, not to prolong a losing case beyond its natural life").

At oral argument the EEOC *did* request permission to replead in the event that the applicable pleading standards had been changed by the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). Even assuming that *Bell Atlantic* changed the level of detail required by notice pleading, which seems doubtful, *see supra* note 1; *see also Ridge at Red Hawk, L.L.C. v. Schneider*, ___ F.3d ___, ___, No. 06-4162, 2007 WL 1969681, *3-4 (10th Cir. July 9, 2007); *Roth v. Jennings*, ___ F.3d ___, ___, No. 06-0784-CV, 2007 WL 1629889, *13, 18 (2d Cir. June 6, 2007); *but see Iqbal v. Hasty*, ___ F.3d ___, ___, 2007 WL 1717803, *8-*11 (2d Cir. June 14, 2007) (noting that *Bell Atlantic* created "[c]onsiderable uncertainty concerning the standard for assessing the adequacy of pleadings" and analyzing "conflicting signals" in the Court's opinion), we hold that the amended complaint failed to provide adequate notice under precedents that long preceded *Bell Atlantic*, so the requested relief is unnecessary.

FLAUM, *Circuit Judge*, concurring.  I join the majority's final conclusions that the EEOC's complaint does not meet the notice pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure and that the EEOC did not plead itself out of court by referring to the charge in its complaint. I respectfully disagree, however, that the complaint was insufficient under our pre-*Bell Atlantic* case law.[1]

In my judgment, the EEOC's complaint—which alleged that Concentra retaliated against Horn because he reported a colorable Title VII violation—was sufficient before *Bell Atlantic*, as I find it difficult to distinguish from other equally sparse pleadings that this Court previously approved. *See Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006) (noting that a complaint would satisfy Rule 8(a) if it alleged that an "employer . . . caused some concrete injury by holding the worker's religion against him"); *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) (noting that a complaint would satisfy Rule 8(a) if it alleged "I was turned down for a job because of my race"). Moreover, other circuits have approved complaints that, for all practical purposes, are the same as the one in this case. *See Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (stating that a complaint in a retaliation case need only say, "[T]he Government retaliated against me because I engaged in protected activity."); *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) ("[T]o plead a retaliation claim under the First Amendment, a

---

[1]  I also disagree with the majority's suggestion that *Bell Atlantic* dismissed the plaintiffs' suit because they pled too much detail. *See* slip op. at n.1. Rather, it appears that the Court dismissed the plaintiffs' complaint because it did not plead enough. *See Bell Atlantic,* 127 S. Ct. at 1964-69 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

plaintiff must allege: (1) constitutionally protected con-
duct, (2) retaliatory action sufficient to deter a person of
ordinary firmness from exercising his constitutional rights,
and (3) a causal link between the constitutionally pro-
tected conduct and the retaliatory action.").[2]

Although I conclude that the EEOC's complaint would
have been sufficient under this and other circuits' pre-*Bell
Atlantic* case law, I am unable to share the majority's view
that *Bell Atlantic* left our notice pleading jurisprudence
intact. Indeed, as I read *Bell Atlantic*, the Supreme Court
in interpreting Rule 8(a) required that a plaintiff plead
enough facts to demonstrate a plausible claim. *Bell
Atlantic*, 127 S. Ct. at 1995 ("Factual allegations must be
enough to raise a right to relief above the speculative
level."). *Cf. Kolupa*, 438 F.3d at 715 (stating that "com-
plaints need not plead facts"). Because in my view the
EEOC's complaint did not meet that threshold, I concur
in the majority's decision to affirm the district court's
dismissal.

---

[2] In *Kyle v. Morton High School*, 144 F.3d 448, 454 (7th Cir.
1998), the pre-*Bell Atlantic* decision which the majority opin-
ion cites approvingly, this Court held that the plaintiff's com-
plaint did not give the defendant notice of his claim because it
did not allege that the plaintiff engaged in protected speech and
pled only legal conclusions without providing any supporting
facts. However, in *McCormick v. City of Chicago*, 230 F.3d 319,
324-25 (7th Cir. 2000), this Court separated itself from the
position that a plaintiff cannot state a claim by reciting mere
legal conclusions. As a result, the *Kyle* approach was limited,
at least to the extent that it required a plaintiff alleging retalia-
tion to provide details about his protected speech.

20                                                       No. 06-3436

A true Copy:

    Teste:

               _____

               *Clerk of the United States Court of*
                   *Appeals for the Seventh Circuit*

**Exhibit 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT JACKSON, JOSEPH McGRATH, and DERRELL SMITH** )<br>)<br>) | |
| **Plaintiffs,** ) | |
| ) | **No.  06 C 0493** |
| **v.** ) | |
| ) | **HONORABLE DAVID H. COAR** |
| **SHERIFF OF COOK COUNTY, COOK COUNTY, ILLINOIS and DIRECTOR, CERMAK HEALTH SERVICES,** )<br>)<br>) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

The parties to this action are: Plaintiffs Robert Jackson ("Jackson"), Joseph McGrath ("McGrath"), and Derrell Smith ("Smith") on behalf of a certified class (collectively "Plaintiffs" or "the class"); Defendant Sheriff of Cook County ("Sheriff"); and Cook County of Illinois ("Cook County") along with the Director of Cermak Health Services ("Cermak"), an operating unit of the Cook County Bureau of Health (collectively "Cermak Defendants").  Now before this court are the following motions: Plaintiffs' Motion for partial summary judgment on liability (Doc. No. 98); Defendant Sheriff's Motion for Summary Judgment (Doc. No. 103); Defendants Cermak and Cook County's Motion for Summary Judgment (Doc. No. 104); and Defendants' motions to dismiss (Doc. Nos. 30, 35).[1]  For the reasons stated below, the motions for summary

---

[1]The parties have also filed motions to strike portions of the Rule 56.1 statements (Doc. Nos. 129, 163).  To the extent that the evidence disputed in those motions was not determinative in deciding the motions for summary judgment, these motions are DENIED as moot.

judgment are DENIED, and Defendants' motions to dismiss are DENIED in part and
GRANTED in part.

## BACKGROUND

The named Plaintiffs represent a class of former inmates of the Cook County Jail who
were subjected to a screening test for sexually transmitted diseases during the facility's intake
process.

Following a bond hearing, all pre-trial detainees admitted to the jail were taken to the
Receiving, Classification, Diagnostic Center ("RCDC") for intake into the facility. The medical
testing portion of this process included x-rays, a medical history, and a urethral swabbing used to
screen for chlamydia and gonorrhea ("STD screening"). Each prisoner would enter the STD
screening room one by one and stand behind a privacy screen, where a Cermak certified medical
technician ("CMT") was waiting to execute the swabbing itself. The CMT asked each prisoner
to lower his pants, inserted a cotton swab two to four centimeters into the prisoner's penis,
rotated the swab, and extracted it in order to collect the required sample for testing. Some
aspects of the process varied from prisoner to prisoner, such as whether or not the prisoner's
penis was held during this process and, if holding was necessary, whether the CMT or the
prisoner did the holding. CMTs wore gloves at all times when in contact with the prisoners,
although the frequency with which they changed these gloves and the ultimate purpose for
wearing them is in dispute. In addition, it is also in dispute whether or not the procedure was
conducted over a garbage can in order to catch possible discharge during the procedure.

Each prisoner was asked to sign a release and consent form for the medical procedures,
which included the following language: "I consent to a medical and mental health history and

physical including screening for tuberculosis and sexually transmitted diseases as part of the

intake process of the Cook County Jail." *See* Resp. to Cert. Mot. Ex. A at 18, Ex. B at 16, Ex. C

at 17.  In at least some instances these forms were signed after the screening process, rather than

before.  Some parties have claimed to have encountered physical coercion themselves or

witnessed it being applied to others by jail guards.  It is generally unclear what level of

knowledge of the procedure prisoners had as they began the swabbing procedure, for although

there was an informational poster in place and some CMTs would solicit questions or provide

information regarding the process, the degree of understanding of prisoners remains unclear.

Cermak is a division of the Cook County Bureau of Health and is therefore distinct from

the Sheriff who was responsible for running Cook County Jail.  Cermak employees entered the

jail in order to conduct these intake tests and executed all aspects of the screening itself.

However, because the screening took place inside the jail, the process was a collaborative one,

Rodriguez Dep. at 43, with jail staff standing nearby at all times in order to ensure security and

forward progress.  A general order promulgated by the Sheriff supports the use of medical

screening during intake, stating that all admitted prisoners should go through such a process.

Plaintiffs filed a complaint citing violations of their constitutional rights under the Fourth

and Fourteenth Amendments pursuant to 28 U.S.C. § 1983, which took its final form as of

February 1, 2006 (Docket No. 7).  In that complaint, Plaintiffs claim that the search violated their

constitutional rights, protected under 42 U.S.C. § 1984, and that the manner in which the test

was conducted was calculated to spread disease.  On December 14, 2006, this court certified a

class made up of: "All male prisoners at the Cook County Jail who, on and after January 27,

2004, was [sic] subjected to the non-consensual insertion of a swab into his penis as part of his admission to the jail."  (Docket No. 101).

## LEGAL BACKGROUND

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986).  On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."  *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material

dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has also made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (clarifying that such evidence is valid to the extent that it is "based on personal knowledge and [sets] forth specific facts showing that there is a genuine issue for trial").

# ANALYSIS

This Court now considers the possibility that the STD screening represents an unconstitutional search or invasion of privacy and, if it is unconstitutional, who is responsible for the violation.  As an initial matter, it should be noted that this case has proceeded to this stage under a particular formulation.  At certification, Plaintiffs maintained an intent "to show in their impending motion for summary judgment that the totality of circumstances at the receiving unit makes it impossible for anyone to give a valid consent to the insertion of the urethral swab." Therefore, to the extent that Plaintiffs' assertions represent unique accounts of individual experiences in the intake process, they are largely irrelevant to a determination of the summary judgment motions; to the extent that the conditions and experiences within the RCDC are not common to the class as a whole, they are either irrelevant to the suit as it now stands or urge reconsideration of certification.

## *Applicable Constitutional Principles*

This case centers on whether the urethral swab that was administered to all admitted prisoners amounts to an impermissible search.  "There is no principle more firmly rooted in our constitutional jurisprudence than that warrantless search is presumptively illegal." *U.S. v. Gamble*, 473 F.2d 1274, *1276 (7th Cir. 1973).  In addition, inmates have a constitutional interest in being able to decline unwanted medical procedures.  *Cruzan v. Dir. Missouri Dep't of Health*, 497 U.S. 261, 278-79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

Defendants claim that the due process protections of the Fourteenth Amendment should be applied to this case instead of the Fourth Amendment analysis that Plaintiffs have urged.  *See,*

*e.g.,* Cermak Defs.' Mot. to Dismiss Mem. at 3-7.  Defendants are correct that Plaintiffs' cited cases do not unequivocally support the application of the Fourth Amendment to this case.  *See Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004) (distinguishing restraint of a prisoner, to which Fourth Amendment was applied, and forced catheterization, which required due process analysis).  However, Plaintiffs' filings do not limit themselves to the Fourth Amendment analysis, as Defendants claim, but rather assume that both or either protections might be applicable.  Corr. Am. Compl. ¶ 11.  In subsequent filings, all parties have focused a great deal of energy on Fourth Amendment law.  That approach was valid.

The Fourth Amendment provides the appropriate standard by which to consider whether the STD screening was constitutional.  Courts have applied Fourth Amendment protections to the collection of bodily substances for analysis or the intrusive inspection of a plaintiff's body when performed on an individual.[2]  *See, e.g., Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (applying the Fourth Amendment to the non-consensual drawing of blood).  Fourth Amendment analysis has also been upheld in cases where the intrusion was performed on a universal or class-wide basis.  *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (upholding Fourth Amendment analysis of the drawing of blood, use of a breathalyzer, and collection and testing of urine performed on all railroad employees); *Bell v. Wolfish*, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. [CITE] . 1861 (1979)

---

[2]Defendant Sheriff has attempted to distinguish *Schmerber* and other applications of Fourth Amendment to prisoner searches on the grounds that it involved an ongoing criminal investigation.  Sheriff's Summ. J. Resp. at 5.  However, in that brief Sheriff goes on to consider several different instances in which the analysis was applied to cases similar to the instant one, and though there is a distinction between the manner in which criminal investigations and prison needs contend with the demands of the Fourth Amendment, those differences are properly subsumed under the "special needs" analysis discussed below.

(post-visitation body cavity search in prison); *Forbes v. Trigg*, 976 F.2d 308 (7th Cir. 1992) (post-visitation urine analysis in prison).  However, it is also true that forcible or unwanted medical procedures have been scrutinized on a due process basis, most often when performed on an individual.  *See, e.g., Cruzan*, 497 U.S. 261.

The STD screening in question falls somewhere between the search procedures to which Fourth Amendment analysis applies and the medical procedures that typically require due process analysis.  *See* Cermak Defs.' Facts ¶ 19(a) ("The reasons for administering the STD test are to protect the community at large, as well as to detect and treat STDs within the Cook County jail population").  However, the case is more appropriately considered as a screening measure put in place to protect the general population.  Therefore, it is not inappropriate to determine the reasonableness of the procedure in light of the Fourth Amendment.  *Accord Thompson v. County of Cook*, 412 F.Supp.2d 881, 890-91 (N.D. Ill. 2005) .  In any event, as other courts have noted there is significant overlap in the analysis required to determine reasonableness under the Fourth and Fourteenth Amendments.  Therefore, even if this Court were to apply the somewhat different standards of the Fourteenth Amendment, the analysis would still involve a fact-intensive inquiry that cannot be decided at summary judgment.

This Court now considers whether the procedure was valid as an exception to the presumption against non-consensual searches, either because (1) it was reasonable in the context in which it was performed, or (2) the Plaintiffs knowingly and willingly consented to the procedure.

*Reasonable as a Matter of Special Need*

The Fourth Amendment forbids only those searches and seizures that are unreasonable, as its purpose is "to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances." *Schmerber*, 384 U.S. at 768. Therefore, this Court must first consider whether or not the testing, when viewed in the totality of the circumstances in which it was performed and any relevant penological interests, was reasonable and therefore immune to constitutional constraints.

Plaintiffs maintain that the balancing weighs in their favor because of the invasive nature of the test and Defendants' failure to adequately define the government interest at stake. Defendants claim that their actions were done to further the health interests of the prison community and the community at large. *See* Sheriff Def.'s Resp. to Summ. J. Mot. at 8-9 ("[T]he sole purpose Cermak performs the STD test is to diagnose, treat, and control the spread of sexually transmitted diseases"; Cermak Def.'s Summ. J. Reply at 5 ("STD testing for infectious diseases has an important penological purpose."). Defendants also maintain that the test itself was minimally invasive and therefore should be treated no differently from the mandatory blood tests that have repeatedly been found valid by other courts.

Particular standards apply to plaintiff claims of constitutional deprivation in the context of legitimate incarceration. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987). The balancing necessary to determine whether an action is reasonable is weighted in favor of prison administration in light of the important need to maintain order within a difficult environment. *Wolff v. McDonnell*, 418 U.S.

539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) ("prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). This reflects the restriction of rights intrinsic to a prisoner's incarceration. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("Loss of freedom of choice and privacy are inherent incidents of confinement."); *see also Madyun v. Franzen*, 704 F.2d 954, 958 (7th Cir. 1983) ("[W]hile inmates are not stripped of their constitutional rights at the prison gate, it also is true that these rights properly are subject to a much greater degree of intrusion than would be allowed outside the prison gate."), cert denied 464 U.S. 996, 78 L.Ed.2d 687 (1983).

Defendants can therefore minimize constitutional scrutiny – making consideration of consent unnecessary – if they can establish the reasonableness of their actions by way of a balancing test. In the context of prison medical examinations, where there is no criminal suspicion on which to base the validity of the search, the balancing centers on whether the government was acting based on a special need "beyond the ordinary law enforcement need." *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004) (finding collection of DNA for the construction of a database was a valid special need) (citing *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir.2003)). This analysis requires consideration of several factors, including: (1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted. *Wolfish*, 441 U.S. at 559; *see also Green v. Berge*, 354 F.3d 675, 678 (7th Cir. 2004) (applying a similar set of factors); *compare Safley*, 482 U.S. at 89-90 (considering (1) the existence of a valid rational connection between the regulation and a

justifying government interest, (2) whether there are other avenues for the exercise of the rights

in question, (3) impact that accommodating the constitutional rights would have on guards, other

inmates, and prison resources generally; and (4) the absence of ready alternatives); *Thompson,*

412 F.Supp.2d 881(applying *Safley* to case involving same Defendants and many of the same

facts as the instant case).

The balancing of interests dictated by the special needs test is necessarily a fact-intensive

inquiry, requiring the court to examine the alleged deprivation in light of the totality of the

circumstances. *See Chandler v. Miller*, 520 U.S. 305, 314, 117 S.Ct. 1295, 1301 (1997)

("[C]ourts must undertake a context-specific inquiry, examining closely the competing private

and public interests advanced by the parties."). Searches conducted within a prison context

therefore might be appropriate in some instances and inappropriate in others, depending on the

reason behind them and the manner in which it is performed. *Compare, e.g., Bell v. Wolfish*, 441

U.S. 520, 559 (1979) (finding Constitutional post-visitation cavity search of felonious prisoners

reasonable for safety reasons) *to Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir.

1983) (declining to uphold cavity search performed at intake on misdemeanor criminals).

As to the underlying value of the screening to the government and the public, Defendants

maintain that the test was performed in furtherance of a "valid penological interest," but speak in

generalities when asked to explain that interest. *See* Def.'s Reply to Facts at ¶¶ 21-23; Cermak

Defs.' Facts ¶ 19(a) ("The reasons for administering the STD test are to protect the community at

large, as well as to detect and treat STDs within the Cook County jail population"); Sheriff's

Facts ¶ 28(a) (same).[3]  Deponents have restated and prioritized these interests, but have done

little to delve further into the specific motivations.  *See, e.g.,* Raba Dep. at 148-150 (stating

intent was to protect the individual prisoner's health, followed by fear of outbreaks within the

prison population and in the general population as additional motivations).  Plaintiffs point out

that the test was not a response to a particular threat posed by an outbreak in either the outside

public or the jail's population.  However, the underlying government interest need not be so

specific or well-defined, provided the deprivation in question survives the balancing of interests

involved.  In addition, there is in fact evidence that STDs are transmitted within the jail, even if

it does not rise to the level of an "outbreak."  *See* Rodriguez Dep. at 90, 99.  Finally, merely

discovering the frequency of infection in the prison population could be considered a special

need.

　　　　Whatever the purported interest in continuing the STD screening, the actions of

Defendants do not indicate that Defendants placed great value in seeing the process performed

effectively.  Defendants failed to distinguish in their record keeping between those who were

tested and those who were not, which would appear to have a significant impact on the

effectiveness of the procedure.  In addition, Defendants appear unconcerned by the fact that

workers at times failed to apply the test due to resource constraints, Sheriff Def.'s Resp. Facts ¶

21, and currently, Cermak is not performing the test at all.[4]  *See* Raba Dep. at 75-81.  It could

---

[3]It is also worth noting that this is the second proceeding in which the Defendants have
been given the opportunity to explain their interest in seeing the test performed, and in both
cases they have had difficulty showing a compelling need that might counterbalance the
prisoners' constitutional rights.

[4]While the threat of the instant lawsuit is perhaps a valid reason to terminate the practice,
the apparent lack of effort in finding an alternative to the urethral swab suggests that the

reasonably be inferred from these gaps in the use of the screening test, as well as its ultimate termination, that STD screening was not a high priority in the jail.

Defendants maintain that the magnitude of the constitutional deprivation is low, so that any balancing test used to analyze the procedure should be decided in their favor. *See* Sheriff's Facts ¶ 26(c); Cermak Defs.' Facts ¶ 18(a). However, this argument fails to withstand any degree of scrutiny. As another court of this district found, urethral swabbing involves "invasion of one of the most intimate and sensitive parts of the male body." *Thomas*, 412 F.Supp.2d at 892 (J. Kennelly). Though Defendants look for support in cases upholding the constitutionality of involuntary blood tests, the rationale for finding blood tests minimally invasive is that drawing blood is a common and therefore expected procedure to which all parties are accustomed. *See Schmerber*, 384 U.S. at 771 ("[A] blood test was a commonplace in these days of periodic physical examinations."). It cannot be said that the forcible insertion of a cotton swab into one's penis is similarly common. In light of this, as well as the physical and social discomfort involved with the procedure, there is little to support Defendants' contention that the urethral swab test is only minimally invasive.

In addition, it appears Defendants made little if any effort to lessen the already invasive nature of the screening process. *See Skinner*, 489 U.S. at 626; *Thompson*, 412 F.Supp.2d at 892. The swabbing was done with a limited level of privacy, relying on a nominally-effective privacy screen to block the sight lines of other prisoners standing at an open doorway. *See, e.g.,* Raba Dep. at 39; *but see* Murphy-Swallow Dep. at 86-87 (comparing the level of privacy to that which is found at another hospital); Morris Second Dep. at 16-17 (claiming that each treated prisoner

underlying need is not great.

-13-

could not be observed by the others).  It was performed in an area that was generally noisy and congested during intake hours.  Raba Dep. at 95.  There is also evidence that the STD screening can be accomplished via a less-intrusive urine analysis, even if there remain questions about such alternatives' cost and effectiveness.  *See, e.g., id.* at 53-54.  Therefore, any claim that this test process is minimally invasive is undermined by Defendants' failure to reduce the impact that it did have on the prisoners.  As stated before, the standards of privacy and freedom from search within a prison are generally lower than that which is found in free society, but the lack of diligence or care with which the procedure seems to have been executed contradicts Defendants' claim that the procedure was an appropriate means of meeting their need.

Finally, the cost, effort, and inconvenience of ensuring that the STD screening passed constitutional muster would not be high.  The easiest method of remedying the problem – ensuring a more voluntary and knowing consent procedure – would not demand significant resources.  And again, though its viability is still in question, urine analysis is another means of testing for STDs that would not raise the same constitutional concerns.  *See* Raba Dep. at 53-55 (acknowledging that the urine analysis is similarly effective but claiming that it is more expensive).

For all of the foregoing reasons, there is insufficient evidence for determining as a matter of law that the STD test is a reasonable search warranted by a special governmental need.  On this point, it is important to keep in mind the ultimate determination that must be made in allowing the government to assert a special need: "the proffered special need...must be substantial-important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized

-14-

suspicion." *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295 (1997).  This bar has not been reached at this stage of the proceedings.

That said, the actions of Defendants were not so unreasonable as a matter of law as to warrant granting Plaintiffs' motion for summary judgment on the issue of liability on this basis. Many of the most inflammatory of Plaintiffs' allegations – that might otherwise urge this Court to find the screening test unreasonable as a matter of law – are also some of the most vigorously contested: the degree of privacy of those undergoing the procedure; the amount and duration of the pain involved; the extent to which genital manipulation by the CMTs is required; the viability of urine analysis or other alternatives; and the impact of the test on reducing the transmission of gonorrhea and chlamydia.  This Court must also be mindful of the leeway given prison administrators who are ostensibly working to support the health of the population under their charge.[5]

Questions of material fact abound.  While Plaintiffs portray the process as forceful, abrupt, impersonal, unyielding, and even malicious, Defendants have presented a very different version of the events in the RCDC.[6]  Final determination of whether the screening was unreasonable relies on a context-specific balancing that should not be settled as a matter of law when such significant questions remain.  Defendants have largely failed to show that the procedure for testing prisoners for STDs is appropriately tailored to meet their need for public

---

[5]Though Plaintiffs have attempted to portray Defendants' motivations as punitive or otherwise hurtful, they have yet to establish this malicious intent on the part of the Defendants and therefore have not undermined this presumption.

[6]According to the account of one volunteer physician, CMTs would focus only on the younger prisoners, would ask if they wanted to have the test done, and even had some prisoners request to have it done.  Raba Dep. at 88-89.

safety with a minimum of constitutional complications.  At the same time, however, the standard is not high – merely establishing the frequency of STDs within a prison population could arguably be a special government need – and Defendants have put forth some evidence of societal benefit from the procedure.  *See* Rodriguez Dep. at 90, 99.  Finally, Plaintiffs go to great pains to establish that the STD screening was inconsistently applied, but there is no hard and fast rule that the testing must be universal in order to represent a special need.  If it is found that the underlying interest of reducing STDs in the prison population was sufficiently compelling, even faulty execution of a policy to address that problem might be sufficient.

For these reasons, all parties' motions for summary judgment are DENIED with respect to whether or not the STD screening is reasonable or unreasonable as a matter of law.

### *Consent*

Despite the fact that the swabbing procedure cannot be found constitutional or unconstitutional as a categorical matter, Defendants nonetheless prevail if they can establish that the Plaintiffs adequately consented to the procedure.  *See Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997).  It is fairly clear that a consent form was signed by all members of the Plaintiff class, but the nature of that consent is still at issue.  In order to prove that a search was unreasonable, then, Plaintiffs must show that the consent was invalid because it was given under duress or coercion.  *Id.* at 1269.  Mere "acquiescence to a claim of lawful authority" does not amount to consent sufficient to avoid liability.  *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968).  Instead, consent must be "freely and voluntarily given" in light of "the totality of the circumstances."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 et seq. (1973).

-16-

Defendant maintains that the consent provided was in all cases voluntarily made by prisoners with a full understanding of the situation they faced.[7]  In support, they generally point to the fact that there is little to no evidence of outright coercive language from the guards, or words of protest from Plaintiff class members.  *See generally* Sheriff's Summ. J. Resp. at 5-7. Plaintiffs respond that none of the class members knew they could decline the STD screening and that they all believed failing to go through any given stage in the intake process would be met with forceful or punitive measures.  *See, e.g.*, Morris Dep. at 12-15 (evidencing, through leading questions, an impression that the process was required and a lack of awareness regarding the nature of the STD test).  Much of the deposition testimony on this issue appears forced and/or unclear, and Defendants have previously complained that the affidavits are written in stock language that does not appear to reflect individual impressions.  However, determining such issues of credibility should take place where the facts can be brought out in an adversarial proceeding before a proper factfinder.  In any event, nearly all of the Plaintiff deponents expressed some awareness of institutional pressure to acquiesce to the screening process and, in particular, the urethral swabbing.  *See* Second Morris Dep. at 19 (describing the COs' language to move the crowd along, "keep walking, don't look back").  Some even claimed to have witnessed direct use of force where prisoners stepped out of line, *see, e.g.,* Roberson Dep. at 19:4-21, or suffered it themselves at some point in the intake process, *see* Ellis Dep. at 31-34.

---

[7]It appears that in some cases, prisoners actually wanted the STD screening to be performed.  At least one prisoner had previously received a similar test outside the prison and actually wanted to have it done to see if he had contracted anything.  *See* Second Morris Dep. at 18: 19-20.

-17-

There are several important indications that the consent was not willingly given.  Though Defendants maintain that all prisoners had the option of declining the test, there is sufficient indication that they *believed* the guards would force them, creating an issue of fact on this point. Defendants concede that the guards, though not directly involved in the medical screening, nonetheless served in an enforcement capacity and were near enough to intervene where necessary.  This could be perceived as a coercive threat that places the willingness of consent in question.  The validity of the consent is also called into question by the fact that the prisoners were forced to make this decision toward the end of an extensive intake process, and in many instances claim they had no idea what was happening until the STD screening was actually taking place.  It is uncontested that there were posters in the screening room that described the process, but this does not establish that they were correctly placed, read by members of the class, or adequate for explaining the process.

The evidence does not portray particularly coercive actions on the part of the guards.  At the same time, the overall environment in which the prisoners found themselves could reasonably have given the impression that there was no choice available.  Even where signed, it is possible that the consent clause represented an invalid consent to the search.  In *Thompson v. County of Cook*, it was noted that the consent did not even mention the type of test that would be performed.  412 F.Supp.2d at 891.  In light of the relative obscurity of the urethral swab test, vaguely referencing a test for sexually transmitted diseases would not amount to consent to such an invasive and unexpected procedure.  In addition, in at least some instances the consent was not even given before the procedure was carried out.  *See* Defendant Sheriff's Resp. Facts ¶ 27.

In light of these facts, summary judgment based on the presence of consent would be inappropriate.

There remain significant questions of fact regarding the consent forms, including the knowledge, willingness, and scope with which Plaintiffs' signed them.  Because the adequacy of this process is necessarily a fact-intensive inquiry, a decision as a matter of law is inappropriate where material facts remain in dispute.  Summary judgment in favor of Defendants on this basis is therefore DENIED.

## *Liability of Sheriff of Cook County*

Plaintiff has claimed that the STD screening "was conducted in accordance with an explicit policy of the Sheriff of Cook County or an explicit policy of Cermak Health Services or, in the alternative, was a practice that was so permanent and well-settled at the Cook County Jail that it constitutes a custom or usage."  Corr. Am. Compl. ¶10.  Defendant Sheriff has now moved for summary judgment in part on the grounds that he cannot be found liable under § 1983 in the absence of direct involvement in the STD screening process.  Sheriff's Summ. J. Mot. at 4-6.  It is of course true that the officers did not directly conduct the procedures in question, and that mere supervisory authority is insufficient for finding fault under § 1983.  Nonetheless, the degree of supervision, and the Sheriff's adoption of a policy for facilitating the screening, could nonetheless amount to a knowing and substantial deprivation of constitutional rights.

Liability under § 1983 arises only when a defendant is personally responsible for the deprivation of which the plaintiff complains.  *See Jones v. Drew*, 2007 WL 737359, at *3 (7th Cir. 2007).  To be personally liable for a subordinate's acts, a supervising official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye."  *Id.* (citing

-19-

*Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)). Those in a supervisory position can also

be found liable if a custom or policy of depriving constitutional rights exists. *See Calhoun v.*

*Ramsey*, 408 F.3d 375, 379 (7th Cir.2005) ("[M]unicipal liability exists only 'when execution of

a government's policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the injury.' ") (quoting *Monell v. N.Y.*

*Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). An unconstitutional policy or custom can take

one of three forms: "(1) an express policy that, when enforced, causes a constitutional

deprivation; (2) a widespread practice that, although not authorized by written law or express

municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the

force of law; or (3) an allegation that the constitutional injury was caused by a person with final

policymaking authority." *Rashe v. Beecher*, 336 F.3d 588, 597 (7th Cir. 2003).

  In Illinois, the Sheriff of Cook County and Cook County itself are distinct entities, and

neither is considered an authority over the other. The Sheriff is a county official charged with

"final policymaking authority over the jail." *DeGenova v. Sheriff of DuPage County*, 209 F.3d

973 (7th Cir. 2000) (citations omitted). Because he or she is an elected county official, the

Sheriff is empowered to execute these duties in manner "independent of and unalterable by any

governing body." *See Moy v. County of Cook*, 640 N.E.2d 926, 929 (1994) (finding no master-

agent relationship between the two with respect to jail functions, based primarily on the

County's inability to terminate or control). Likewise, the County is under no obligation to bend

to the Sheriff's authority.

  Defendant Sheriff encouraged this Court to dismiss the suit in light of the decisions and

outcome of an almost identical factual situation before Judge Kennelly. *See Lawrence E.*

*Thompson v. County of Cook and Michael Sheahan*, 03-CV-7172.  On February 7, 2006, that

court granted Defendant Sheriff's Rule 50 motion to dismiss the Cook County Sheriff after the

close of the Plaintiff's case.  This Court is not aware of the basis for this decision, though

Defendant Sheriff has submitted its memorandum corresponding to the issue in that case.  It is

certainly true that the instant matter is largely indistinguishable from Thompson's urethral

swabbing claims before Judge Kennelly.  However, that ruling was based on the record before

that court, made only after the case had proceeded to trial.  It cannot be said that, as a matter of

law, the evidence in this case will not show that the Sheriff's policies with respect to STD

screening amounted to a constitutional violation.  Collateral estoppel cannot be applied to

expand the findings of an individual's case to an entire class absent evidence that the class's

interests were adequately represented.  *Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd LLC*,

383 F.3d 633, 636 (7th Cir. 2004).  In terms of the facts presented, this Court cannot simply

adopt another record as its own.  Judge Kennelly's ruling therefore has no effect on the instant

case.

Based on the record of this case, there is no proof that the Sheriff was directly involved in

any of the steps in the swabbing process itself – i.e., note-taking, obtaining consent, or inserting

the cotton swab – and liability for the alleged deprivation does not attach on this basis.  It is also

clear that the Sheriff's general administrative responsibilities do not create liability for the

actions of his employees.  The safety and welfare of Cermak employees and the prisoners they

were testing demanded that the Sheriff's staff be closely involved in the process, as the general

security of the facility of the jail and its occupants fall under the general supervisory

responsibilities of the sheriff.  But again, the Seventh Circuit has made clear that this general

authority of a warden is not sufficient for establishing liability.  *Kelly v. Mun. Courts of Marion County, Ind.*, 97 F.3d 902, 909 (7th Cir.1996) (explaining that prison administrators are not "personally involved" in every § 1983 violation within that prison).  Plaintiffs' reliance on this general supervisory responsibility and *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000) is therefore misplaced.

Nonetheless, the Sheriff's complicity in the screening process involves a more substantial connection between his or her policies and the alleged deprivation, which may amount to Section 1983 abuse.  *See Calhoun,* 408 F.3d at 379.  There was a policy in place of facilitating Cermak in carrying out its medical screening duties.  If the STD screening that was a part of that process is deemed reasonable as a categorical matter, it is partly due to the jail's interest in the health and welfare of those incarcerated there, and is something that could not happen without the Sheriff's assistance.  If the question becomes one of consent, the alleged coercion that would negate that consent is caused in some part by the presence and/or actions of those acting under the Sheriff's policies.  The record therefore leaves open the possibility that those working for the Sheriff were responsible for the alleged constitutional deprivation because they "kn[ew] about the conduct, facilitat [ed] it, approve[d] it, [and] condone[d] it," *Hildebrandt v. Illinois Dept. of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003), in acting on the Sheriff's policies.

The question of constitutionality in this case is not solely whether or not the STD screening was done or how it was done as a medical procedure.  *See* Defs.' Summ. J. Resp. at 11-13.  Plaintiffs' case also calls into question the surrounding environment in which it was done.  Even if the Sheriff could not control the medical process itself, the jail hierarchy with respect to timing, logistics, safety, and physical security may have implicated the Sheriff's staff

in affecting the manner in which it was performed.  *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (requiring that the policy or practice must be the "direct cause" or "moving force" behind the constitutional violation).  Therefore, Sheriff's policies might be deemed  a "direct cause" or "moving force" behind the allegedly unconstitutional way in which the procedure was done, even if they were not a "direct cause" or "moving force" behind the existence of the procedure itself.

## MOTIONS TO DISMISS

Defendants had moved to dismiss this action based only on the allegations of the complaint, and those motions are largely dismissed as moot insofar as they have now been considered through summary judgment.  However, several claims should be addressed as a matter of course.  Defendants have alleged the following: the claim against Director of Cermak should be dismissed based on the redundancy of including both the Director and Cook County as Defendants; the entire suit should be dismissed due to Plaintiffs failure to allege "deliberate indifference" or a concrete injury; the Cermak Director claims qualified immunity because the case involves overcrowding issues covered under the Duran consent decree; and the entire case should be dismissed due to the collateral estoppel effects of *Duran v. Sheahan*, 74 C 2924 ("*Duran*").  For the reasons stated below, these motions are DENIED in part and GRANTED in part.

### *Standard*

On a motion to dismiss, the Court accepts all well-pleaded allegations in the plaintiff's complaint as true.  Fed. R. Civ. P. 12(b)(6).  The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case.  *Gibson v. City of Chicago*,

-23-

910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted).  A complaint should not be dismissed "unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).  Any ambiguities are construed in favor of the plaintiff.  *Curtis v. Bembenek*, 48 F.3d 281, 283 (7th Cir. 1995).  However, the court need "not strain to find inferences favorable to the plaintiffs which are not apparent on the face of th[e] . . . complaint." *Coates v. Illinois State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1977).

A complaint that complies with the Federal Rules of Civil Procedure cannot be dismissed because it fails to allege facts.  The Rules require simply that the complaint state a claim, rather than plead facts that would establish the validity of that claim.  *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002).  "All that need be specified are the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer."  *Id*. (citing *Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 863 (7th Cir. 2002)).  The Seventh Circuit has ruled that stating a claim in federal court requires only "a short statement, in plain (that is, non-legalistic) English, of the legal claim." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999). Plaintiffs "don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." *Id.*  "At this stage of the litigation, we are concerned not with what plaintiff did or did not show, but rather with what plaintiff did or did not allege."  *Bworn v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005).

Complaints need not plead law or match facts to every element of a legal theory.  *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *see also Scott v. City of Chicago*, 195 F.3d 950, 952 (7th Cir.1999); *Hefferman v. Bass*, 2006 WL 2973677, at *3 (7th Cir. 2006) (stating that it is

-24-

not necessary to "allege facts supporting each of the elements of the claim").  Rather, Plaintiff

must simply plead "sufficient facts...to allow the court and the defendants to understand the

gravamen of the plaintiff's complaint," *Doherty v. City of Chicago*, 75 F.3d 318 (7th Cir. 1996).

In order to determine whether this requirement has been met, the court may consider facts

alleged in the related state action.  *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir.

1994).

## *Analysis*

Cermak Defendants argued that Plaintiffs allege no actual injury amounting to a

constitutional deprivation, and that the lack of consent or other failures amount to mere

negligence that cannot be brought under Section 1983.  Cermak Defs.' Dismiss Mem. at 9.

However, in attempting to prove this point Cermak Defendants conflate "serious deprivation" of

a constitutional right – which is required – with the presence or absence of a physical injury –

which is not.  *See, e.g., Rowe v. Shake*, 196 F.3d 778, 781 (7th Cir.1999) ("a prisoner is entitled

to judicial relief for a violation of his First Amendment rights aside from any physical, mental, or

emotional injury he may have sustained.").  This argument is therefore unavailing.

Defendant Director of Cermak has questioned whether he or she is properly included as a

Defendant in this case.  Departments within a governing body generally lack the required

separate legal existence to be held individually accountable.  *Jordan v. City of Chicago, Dept. of

Police*, 505 F.Supp. 1, 4 (N.D.Ill.1980).  The question of Cermak's independence from the

County of Cook, and therefore the propriety of holding both of these Defendants liable in the

instant case, has been disputed before.  *See Williams v. Fairman*, 1995 WL 571729 (N.D.Ill.

1995).  Other courts have found that Cermak is a subservient division of Cook County, and that

-25-

Cermak's officers cannot be held liable concurrently with the County itself. *See Glass v. Fairman*, 992 F.Supp. 1040, 1043 (N.D. Ill. 1998); *Williams v. Fairman*, 1996 WL 164289, at *2 (N.D. Ill. 1996) (finding that the relevant ordinance "clearly defines Cermak as being a department within the County of Cook" and concluding that "Cermak lacks the capacity to be sued, and should be dismissed from this case").

Plaintiffs have argued that Defendant's argument on this point "is without merit because plaintiffs allege that the Director (and not Cook County) shares responsibility with the Sheriff for the challenged practice." Pl.'s Opp. to Mot. to Dismiss at 6. However, this is irrelevant in light of the fact that the Director stands as a defendant only in his or her official capacity and official capacity liability is indistinguishable from that of the ultimately responsible governmental body. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citations omitted). Plaintiff has failed to advance any other arguments regarding this issue. They have conceded that Cermak is "a division of the Cook County Bureau of Health Services," Pls.' Summ. J. Mem. at 2, which in turn is a division of Cook County for purposes of attributing liability. Insofar as the case has been brought against the Director of Cermak in his or her official capacity and the County is ultimately responsible for the policies of his position, Defendant Director of Cermak's motion to dismiss is GRANTED.

The remaining arguments in Defendants' motions to dismiss are unavailing. The *Duran* decree has no collateral estoppel effects on this court as, according to its terms, it is only binding on future equitable actions, *Martin v. Davies*, 917 F.2d 336 (7th Cir. 1990), regarding a particular range of overcrowding issues, *Walker v. County of Cook*, 2006 WL 2161829, at *3 (N.D. Ill. 2006). The instant case seeks only damages and was not an issue considered in or

encompassed by *Duran's* consideration.  Defendants requests for qualified immunity are out of place, as Defendants are appearing only in their official capacities.  *Ruffino v. Sheahan*, 218 F.3d 697, 700 (2000)("... it is well established that the qualified immunity doctrine does not apply to official capacity cases").  Therefore, all remaining motions to dismiss are DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiffs' and Defendants' motions for summary judgment are DENIED, and Defendants' motions to dismiss are GRANTED in part and DENIED in part.


Enter:


/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **March 23, 2007**

**Exhibit 3**

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.0
### Eastern Division

Robert Jackson, et al.

                                        Plaintiff,

v.                                                      Case No.: 1:06–cv–00493
                                                        Honorable David H. Coar

Sheriff of Cook County, et al.

                                        Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, July 17, 2007:

     MINUTE entry before Judge David H. Coar :Status hearing held on 7/17/2007. Settlement approved by Board. Objections/opt outs to the settlement to be filed 30 days prior to Fairness hearing by 9/27/2007.Fairness hearing set for 10/31/2007 at 09:00 AM (signature order to follow from plaintiff). Mailed notice(pm, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**Exhibit 4**

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 552 | **DATE** | 5/10/2007 |
| **CASE TITLE** | Young vs. County of Cook | | |

**DOCKET ENTRY TEXT**

Status hearing held and continued to 8/29/2007 at 9:30 am.  Plaintiff's motion to compel is entered and continued to 5/17/2007 at 9:30 a.m.  Fact discovery cutoff set to 12/3/2007.  Plaintiff's 26(a)(2) disclosures due 1/7/2008, and defendant's by 2/7/2008.  Expert discovery cutoff is 3/7/2008.

00:08

| | Courtroom Deputy Initials: | OR |
|---|---|---|

# CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of August, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Maureen O. Hannon, Ass't State's Atty, 500 Richard J. Daley Center, Chicago, Illinois 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/ Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)