IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Robert Harper | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 07 CV 2393 |
| *-vs-* | ) | |
| | ) | *(Judge Darrah)* |
| Sheriff of Cook County, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFFS' REPLY MEMORANDUM
## IN SUPPORT OF CLASS CERTIFICATION

Plaintiff Robert Harper has asked the Court to allow this case to pro-

ceed as a class action. Defendants, while opposing class certification, have

presented facts which show that the appropriate class definition is:

> All persons processed into the Cook County Jail on and after
> May 2, 2005 while that person, or someone acting on his (or
> her) behalf, sought to post cash bond.

Plaintiff responds to defendants' arguments below, and demonstrates

the Court should allow the case to proceed as a class action under Rule

23(b)(3).

## I. The Class Claims Present Common Questions of Fact and Law and Do Not Turn on "Factual Discrepancies"

There is no merit in defendants' argument that the class claims turn

on "a variety of options regarding the procedure to post bond." (Def.Mem.

13.) Plaintiff shows below that the class claims turn on four common ques-

tions of law and fact.

A judge sets bond for all arrestees by 2:45 p.m. each weekday. (Def.Mem. 2.)  After the judge has set bond, defendants assign an "ID" number (also known as a "CIMIS" number) to each arrestee.  (Def. Mem. 4.) Defendants assert that they do not permit anyone to post bond until after the "ID" number has been assigned. [1]  *Id.*

This first question common to the class is whether there is any legitimate need to assign a jail "ID" number to any arrestee who is ready, willing, and able (either individually or through a friend or family member) to post bond.

Arrestees are held in deplorable conditions while they wait to be assigned "ID" numbers.  The holding cell is an "unsanitary animal cage," (Complaint, par. 7), characterized by non-functioning toilets "overflowing with feces and urine."  (Sworn Declaration of Christopher Leclair, Exhibit 7, par. 4.)

Defendants assert that once all "ID" numbers have been assigned, arrestees (either individually or through a friend or family member) are permitted to post cash bond.  The experience of members of the putative class is quite different.  This dispute forms the second question common to the class.

---

[1]  This is a disputed question.  See *infra* at 4-5.

Sherman Esper arrived at the jail with cash to post bond, but was told that he had to be "processed" into the jail before he could post bond. (Sworn Declaration of Sherman Esper, Exhibit 3, par. 4.)  This processing involved several hours in an unsanitary holding cell, a chest x-ray, the taking of blood, and an "embarrassing and humiliating strip search."  (Id., par. 3.)

Martha Hines attended her husband's bond hearing and had the cash with her to post bond.  (Sworn Declaration of Joseph Hines, Exhibit 5, par. 4.)  She was not permitted to post bond until 5 p.m.  *Id.*  Her husband, Joseph Hines, was not released until about 9:30 p.m. *Id.*

Carolyn Johannessen attended her brother's bond hearing and tried to post cash bond immediately after the hearing.  (Sworn Declaration of Christopher Leclair, Exhibit 7, par. 4.)  She was required to wait ten hours, however, before she was permitted to post bond.  *Id.*

Benci Wallace was not permitted to post bond until after 5:00 p.m., while her brother Sylvester Locke was "processed" into the jail.  (Sworn Declaration of Exhibit Sylvester Locke, 8,  par. 4.)

Barbara Ammons attended her son's bond hearing and had the cash to post bond; her son, Kenneth Ammons, was, however, "processed" into the jail and held for about five hours before Mrs. Ammons was permitted to post bond.  (Sworn Declaration of Kenneth Ammons, Exhibit 1, par. 4.)

Walter Kapusciarz was held for "processing" for about fourteen hours while a friend sought to post bond. (Sworn Declaration of Walter Kapusciarz, Exhibit 6, par. 4.)

Similar reports of unreasonable detention are made in sworn declarations submitted by nine other members of the proposed class. (Sworn Declaration of William Gaddy, Exhibit 4; Sworn Declaration of Sylvester Locke, Exhibit 8; Sworn Declaration of Charles Norville, Exhibit 9; Sworn Declaration of Loren Person, Exhibit 10; Sworn Declaration of Gregory Rainey, Exhibit 11; Sworn Declaration of Agenol Rodriguez, Exhibit 12; Sworn Declaration of John Taylor, Exhibit 13; Sworn Declaration of Carmen Verlotta, Exhibit 14; Sworn Declaration of Calvin Walker, Exhibit 15.)

Defendants do not require each arrestee to undergo this treatment before the arrestee (either individually or through a friend or family member) is permitted to post cash bond: Plaintiff alleges that defendants permit persons of wealth, clout, or political influence to post bond without being assigned a "CIMIS" number and without being processed into the jail. Defendants do not admit this practice, but it is supported by the attached sworn declaration from Frederick Burton. (Exhibit 16.)

In August of 2002, Burton was employed by the Sheriff as a correctional officer at the jail. (Exhibit 16, par. 2.) Burton was arrested on August 12, 2002 and charged with a felony offense. (Exhibit 16, par. 3.) Bur-

ton's wife was present at his bond hearing and had the cash with her to post bond. (Exhibit 16, par. 4.)   Mr. Burton was not processed into the jail. (Exhibit 16, par. 5.)  Instead, at the conclusion of the bond hearing, Mrs. Burton was allowed to post cash bond and her husband was released on bail without ever reaching the bullpen.   *Id.*  Mr. Burton, who began to work at the jail in 1994, describes his experience as typical for persons of "clout." (Exhibit 16, par. 6.)

None of the members of the putative class experienced the prompt release from custody which defendants provided to Mr. Burton.  Defendants concede that plaintiff was held in custody for seven hours after his wife posted cash bond.  (Def.Mem. 2.)  Similar delays appear in the sworn declarations attached to this memorandum.  (Exhibit 2, par. 4 (7 hours); Exhibit 5, par. 4 (four and half hours); Exhibit 6, par. 4 (14 hours); Exhibit 10 (four to five hours); Exhibit 15 (five hours).  While defendants seek to justify these lengthy delays as necessary "to assure that the Sheriff's office is not releasing the wrong individual," (Def.Mem. 4), the fourth question common to the class is whether there is a lawful justification for the lengthy continued detention after bond has been posted.

These four common questions of law and fact satisfy the commonality requirement of Rule 23(a) because "class members share common questions of law or fact."  *Rosario v. Livaditis*, 963 F.2d 1013, 1028 (7th Cir. 1992).

Defendants' argument to the contrary is simply to deny the existence of the policies and practices which underlie the common questions. (Def.Mem. 8-9.) This argument is without merit because "even a ruling that a plaintiff's claim is "unsound doesn't mean that a class action by the plaintiff is doomed to failure." *Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008). The Court should reject defendants' challenge to the commonality requirement of Rule 23(a). The same is true for defendants' claim of difficulty in identifying class members.

## II.   Membership in the Proposed Class Is Easily Ascertainable

There is no merit in defendants' argument that "the proposed class cannot be objectively defined and is not administratively feasible." (Def.Mem. 2.) Defendants have raised the same argument in several other class actions, all without success. See, e.g., *Rahim v. Sheahan, 99 C 395,* N.D.Ill (Mem.Op. October 19, 2001, 20, attached as Exhibit 17); *Bullock v. Sheahan*, 225 F.R.D. 227, 229 (N.D.Ill. 2004); *Jackson v. Sheriff of Cook County,* 06 C 493, N.D.Ill. (Mem.Op., December 14, 2006, 12-13, filed as Exhibit G to Defendant's Memorandum); *Young v. County of Cook,* 06 C 552, (Mem. Op., April 25, 2007, 13-14, filed as Exhibit J to Defendants' Memorandum).

The proposed class of "all persons processed into the Cook County Jail on and after May 2, 2005 while that person, or someone acting on his

(or her) behalf, sought to post cash bond" is readily ascertainable from defendants' records, which identify the persons released from the jail on cash bond posted the same day that the arrestee was assigned his (or her) jail identification number:

Defendants assert that the proposed class includes persons who were released after a judge found a lack of probable cause to detain. (Def.Mem. 7.) This claim does not make any sense: After finding a lack of probable cause to detain, a judge would not remand any such person to the custody of the sheriff, but would order his (or her) immediate release. *Gerstein v. Pugh,* 420 U.S. 103, 115 (1975) (following common law rule that absent a post-arrest finding of probable cause, prisoner "would be discharged from custody").

Defendants also assert that the proposed class includes persons released on an individual recognizance (or "I") bond. (Def. Mem. 7.) These persons are also not remanded to the custody of the sheriff, but are released from custody upon execution of their recognizance.

Defendants' final claim is that the proposed class includes persons released on electronic monitoring. (Def.Mem. 7.) This contention is difficult to follow because the Sheriff's computer records would allow the easy identification of any person released on electronic monitoring the same day that he (or she) was processed into the jail.

The record in this case shows that it is "administratively feasible" to determine the identity of class members. *Wallace v. Chicago Housing Authority,* 224 F.R.D. 420, 425 (N.D.Ill. 2004). The Court should overrule defendants' arguments to the contrary.

## III.  The Proposed Class Satisfies the Numerosity Requirement of Rule 23(a)

Plaintiff identified more than 3000 potential class members in his class motion. Defendants dispute this number, arguing that it is a "speculative theory" that each person released on bond the same day that he (or she) was assigned an "ID" number was held in custody after the arrestee or a friend or family member sought to post bond. (Def.Mem. 7.)

Plaintiff attaches 15 sworn declarations of members of the putative class. (Exhibits 1-15, attached.) That plaintiff's counsel was able to obtain 15 declarations in the two weeks after defendants filed their memorandum on April 11, 2008 shows that counsel's estimate "is rooted in common sense, not speculation." *Young v. County of Cook*, No. 06 C 558 (Mem.Op., April 25, 2007, 6).

In *Jackson v. Sheriff,* 96 CV 493, N.D.Ill., the Sheriff and Cook County also argued that the proposed class lacked numerosity. There, the plaintiffs came forward with sworn declarations from 17 members of the putative class. *Jackson,* Mem.Op., December 14, 2006, 6, attached as Exhi-

bit "E" to Defendants' Memorandum in Opposition to Class Certification. The district judge in *Jackson* overruled defendants' objections to numerosity, concluding that "this putative class is sufficiently numerous for determining that certification would be more efficient than resolution through joinder or multiple legal actions." (footnote omitted) *Jackson, supra,* Mem.Op. 6.  The same result is required here.[2]

## IV.   The Proposed Class Satisfies the Typicality Requirement of Rule 23(a)

The typicality requirement of Rule 23(a) is "closely related to the commonality requirement" *Ruiz v. Stewart Assoc., Inc.,* 171 F.R.D. 238, 242 (N.D.Ill. 1997).   The accepted and ordinary rule is that "[t]ypicality is shown when the named plaintiffs' claims arise from the same event or practice as the claims of the proposed class and are based on the same legal theory." *Bullock v. Sheriff,* 225 F.R.D. 227, 230 (N.D. Ill. 2004).

---

[2] One judge in this district has endorsed a rule of thumb that 40 class members satisfies the numerosity requirement of Rule 23(a).   *Hernandez v. Chase Bank USA, N.A.*, 243 F.R.D. 285, 287 (N.D.Ill. 2006).   Other courts have found this element satisfied when the putative class consists of as few as 10 to 40 members. *Block v. Abbott Laboratories*, 2002 WL 485364, *3 (N.D.Ill. 2002).  See. e.g., *Rosario v. Cook County,* 101 F.R.D. 659, 661 (N.D. Ill. 1983) (class of 20); *Allen v. Isaac,* 99 F.R.D. 45, 53 (N.D. Ill. 1983) (class of 17); *Davy v. Sullivan,* 354 F.Supp. 1320, 1325 (M.D. Ala. 1973) (class of 10). Plaintiff's counsel has estimated that the class in this case consists of more than 5700 persons.  (Class Motion, par. 5.)

Defendants appear to agree that the claims of the named plaintiff arise from the same practice as the claims of the proposed class. Nonetheless, defendants argue that plaintiff's claim is not typical "because each particular detainee will have a particular fact scenario as to the type of bail that was set in each case." (Def.Mem. 9.) This argument is without merit because nothing in this case turns on "the type of bail that was set." (Def.Mem. 9.) Moreover, there are only three types of bail in Illinois criminal procedure: cash bond, a personal recognizance bond (referred to as an "I" bond in the Circuit Court of Cook County), or a bond secured by real property. Persons released on a personal recognizance bond or on a property bond are not in the class.

Equally without merit is defendants' attempt to exclude female detainees from the proposed class. (Def.Mem. 9.) That female detainees "have a scanner as part of the search" is not material to the class claim that defendants employ practices which unreasonably delay the release of persons who are ready, willing and able to post cash bond. The Court should overrule defendants' typicality challenges.

## V.   Plaintiff and His Attorneys Satisfy the Adequacy Requirement of Rule 23(a)

Defendants appear to concede that the named plaintiff is represented by attorneys who are skilled and experienced in litigating class actions. Nor do defendants dispute that the adequacy of class counsel is

part of a Rule 23(a)(4) determination. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir. 1993).

Defendants also appear to concede that the named plaintiff does not have any interest which is conflict with the interests of the members of the proposed class.  Defendants challenge compliance with the adequacy of representation requirement of Rule 23(a)(4) on the ground that "the Plaintiff cannot state an actionable claim, and therefore is not an adequate representative." (Def.Mem. 10.) The Court should reject this argument.

Defendants advanced the same argument in opposing class certification in *Young v. County of Cook*, No. 06 C 558.   The district judge roundly condemned this argument in his order granting class certification.  *Young,* Mem.Op., April 25, 2007, 15-16, filed as Exhibit J to Defendants' Memorandum in Opposition to Class Certification.

Defendants' argument flies in the face of the principle established nearly 30 years ago in *United States Parole Commission v. Geraghty,* 445 U.S. 388 (1980) that even a ruling that a plaintiff's claim is "unsound doesn't mean that a class action by the plaintiff is doomed to failure." *Wiesmueller v. Kosobucki*, supra, 513 F.3d 784, 786 (7th Cir. 2008).

The named plaintiff is an adequate representative of the proposed class and is represented by competent counsel.  The Court should reject defendants' challenge to the adequacy requirement of Rule 23(a).

## VI.   The Case Should Be Certified Under Rule 23(b)(3)

Defendants recognize that class certification under Rule 23(b)(3) requires plaintiffs to show first that "questions of law or fact common to the members predominate over questions affecting only individual members" and second, "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." (Def. Mem. 10, quoting Rule 23(b)(3).)

Plaintiff has set out at 2-6 above the four common questions of law and fact and, as in *Jackson v. Sheriff*, No. 06 C 493, N.D.Ill, has carefully framed class claims to "shift[] the debate toward questions that are resolvable without delving into an individualized analysis of minor factual discrepancies." *Jackson, supra,* Mem.Op., December 14, 2006. Although defendants strive valiantly to manufacture individual questions for each member of the proposed class, none of these phony issues is material to the common questions of law and fact presented in this case.

The common question of whether there is any legitimate need to assign a jail "ID" number to any arrestee who is ready, willing, and able (either individually or through a friend or family member) to post bond (discussed *ante* at 2), has nothing to do with "the detainees' history, the amount of bond, compliance, and cooperating while proceeding through receiving." (Def.Mem. 13.)

Similarly, the common question of whether defendants refuse to accept cash bond until the late afternoon, resulting in several hours of incarceration for an arrestee who is ready, willing, and able to post cash bond (discussed *ante* at 2-4), has nothing to do with "the volume and activity in the Sheriff's Receiving Divison that evening." (Def.Mem. 13.)

In the same vein, whether defendants permit persons of wealth, clout, or political influence to post bond without being assigned a "CIMIS" number and without being processed into the jail (discussed *ante* at 4-5), has nothing to do with "individual issues" (Def.Mem. 13), of class members (none of whom received this special treatment).

Finally, whether there is a lawful justification for requiring arrestees to remain in custody for several hours after cash bond has been posted in for an "interview, a photograph, and a fingerprint" (Def.Mem. 4-5, discussed *ante* at 5), has nothing to do with any "individual and fact intensive" inquiry. (Def.Mem. 12.)

A class action is also superior to other means of resolving the class claims. As in *Robledo v. City of Chicago,* 444 F.Supp.2d 895 (N.D.Ill. 2006):

> Plaintiffs allege constitutional violations on the part of defendants. It is likely that this conduct would go otherwise unchallenged if a class was not certified because the value of the individual claims in this case is likely not large enough to justify individual prosecution. Additionally, because the claims of all plaintiffs turn on the same law and standardized practices, individual adjudication of the claims of each class member would be an inefficient use of judicial resources.

*Robledo*, 444 F.Supp.2d at 908.

Defendants are simply wrong in asserting that the claims presented in this case have been or are being litigated in *Jackson v. Sheriff,* 06 C 493, *Young v. County of Cook,* 6 C 552, or *Duran v. Elrod,* 74 C 2949.

*Jackson*, which was recently settled, involved STD testing of males processed into the jail. (Def.Mem. 5.)  *Young,* which is currently awaiting trial, challenges various aspects of the jail's strip search policies. (Def.Mem. 6.)  *Duran* is a jail conditions case, which "does not address damage claims," but is limited to equitable relief.  *Martin v. Davies,* 917 F.2d 336, 340 (7th Cir. 1990).  Nothing in any of these cases has, or will, resolve the claims asserted for the proposed class in this case.

Defendants stoop to groundless and irresponsible name calling in asserting that plaintiffs' counsel are "bring[ing] the same suit again and again." (Def.Mem. 14.)  Counsel could not raise the class claims asserted in this case in *Jackson*, because defendants' bail release practices have nothing to do with mandatory STD testing.  Nor are the class claims of this case appropriately raised in *Young,* which focuses on the legality of strip search practices.  It is simply wrong for defendants to assert that plaintiff and the members of the proposed class "had the opportunity to recover [damages]" in *Jackson* and *Young* for the practices challenged in this case.

The class claim in this case involves issues which may "readily may be resolved for a class as whole," *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 956 (7th Cir. 2006) and which predominate over any individual issues.   Accordingly, because the proposed class satisfies each of the requirements of Rule 23(a), the case should be allowed to proceed as a class action under Rule 23(b)(3).

## VII.   Conclusion

For the reasons above stated, the Court should grant plaintiff's motion and certify plaintiff's proposed class:

> All persons processed into the Cook County Jail on and after May 2, 2005 while that person, or someone acting on his (or her) behalf, sought to post cash bond.

The Court should also appoint Kenneth Flaxman and Thomas G. Morrissey as counsel for the class.

/s/ Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC #830399
200 S Michigan Avenue, Ste 1240
Chicago, Illinois 60604
(312) 427-3200

Thomas G. Morrissey.
10249 South Western Avenue
Chicago, Illinois 60643
(773) 233-7900

*Attorneys for Plaintiff*

**Exhibit 1**

## Sworn Declaration of Kenneth Ammons

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Kenneth Ammons. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on June 20, 2004 and I was assigned CIMIS number 2004-0049100.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my mother, Barbara Ammons, was trying to post bond for me. She attended the bond hearing and had the cash to post bond immediately. I was not released for approximately five hours after entering the jail.

Further I state not.

Dated: April 21, 2008

                                        _Kenneth Ammons_
                                        Kenneth Ammons

**Exhibit 2**

## Sworn Declaration of Wesley Cole

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Wesley Cole. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on November 5, 2006 and I was assigned CIMIS number 2006-0085574.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my father, Wesley Cole III, and a family friend, Kevin Cummings, were trying to post bond for me. They were not allowed to post bond until after 5 pm I was not released until midnight.

Further I state not.

Dated: April 16, 2008

_____

Wesley Cole

**Exhibit 3**

## Sworn Declaration of Sherman Esper

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Sherman Esper. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on January 22, 2006 and I was assigned CIMIS number 2006-0005938.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4.    At the same time that I was being subjected to this treatment, my mother, Ida Esper, and my brother, Calvin Esper, were trying to post bond for me. I had the cash for my bond. After my bond hearing, I asked if I could post bond immediately and was advised by a supervisor that I would have to be processed before bond could be posted. I called my mother and they came right down. Meanwhile, I was mixed in with "non-bond" prisoners who were selling and using drugs and endured guards who were very abusive. I was not released until 7:36 pm

Further I state not.

Dated: April 21, 2008

_Sherman Esper_

Sherman Esper

**Exhibit 4**

04-17-2008 2928

## Sworn Declaration of William Gaddy

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is William Gaddy. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on September 2, 2006 and I was assigned CIMIS number 2006-0067822.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my father, William B. Gaddy, was trying to post bond for me. I was not released for a long time later, right at the time that I was to be sent to a Division.

Further I state not.

Dated:  April 16, 2008

William Gaddy

William Gaddy

**Exhibit 5**

## Sworn Declaration of Joseph Hines

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Joseph Hines. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on July 1, 2006 and I was assigned CIMIS number 2006-0049504.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and  I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4.   At the same time that I was being subjected to this treatment, my wife, Martha, was trying to post bond for me. Martha had the cash with her when she attended my bond hearing but she was told she could not post until after 5 pm. She was treated badly while she was there and was made to leave the building immediately after posting bond. Martha Hines waited in our car for me until 9:30 pm when I was finally released. Upon my release, the money I had on me was not returned and I had to come back again the next day to pick it up.

Further I state not.

Dated: April *16*, 2008

*Joseph E. Hines*
Joseph Hines

**Exhibit 6**

## Sworn Declaration of Walter Kapusciarz

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Walter Kapusciarz. I live in Oak Forest, Illinois.

2. I was processed into the Cook Jail on March 2, 2006 and I was assigned CIMIS number 2006-0016272.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, a friend named Mark Kula, was trying to post bond for me. I was not released for approximately fourteen hours.

Further I state not.

Dated: April 7, 2008

Walter Kapusciarz

**Exhibit 7**

## Sworn Declaration of Christopher Leclair

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Christopher Leclair. I live in Schaumburg, Illinois.

2. I was processed into the Cook Jail on February 28, 2006 and I was assigned CIMIS number 2006-0015733.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my sister, Carolyn Johannessen, was trying to post bond for me. Carolyn Johannessen attended the bond hearing and followed me to Cook County Jail with the intention of posting bond immediately. She was made to wait ten hours before she was allowed to post bond. During her ten-hour wait, she had items stolen from her purse. Meanwhile, the toilets in the jail did not work and were overflowing with feces and urine. When I asked the guards for water or to use the bathroom, they would amuse themselves by moving me to another bullpen and telling me that I was about to post bond but now they would keep me longer.

Further I state not.

Dated: April 16, 2008

*Christopher Leclair*

Christopher Leclair

**Exhibit 8**

## Sworn Declaration of Sylvester Locke

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Sylvester Locke. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on December 31, 2005 and I was assigned CIMIS number 2005-0100986.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my sister, Benci Wallace, was trying to post bond for me. Benci was told that she would not be able to bond me out until after 5 pm. I was in a holding cell awaiting a Division assignment, when I was told I had bonded out. It was another two and one half hours before I was actually released.

Further I state not.

Dated:  April 17, 2008

Sylvester Locke

**Exhibit 9**

## Sworn Declaration of Charles Norville

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Charles Norville.  I live in Chicago, Illinois.

2. I was processed into the Cook Jail on February 28, 2006 and I was assigned CIMIS number 2006-0015687.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and  I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4.   At the same time that I was being subjected to this treatment, Henry Pucella, was trying to post bond for me.  I was in a holding cell awaiting my Division assignment when I was told that I had been bonded out.

Further I state not.

Dated:  April 1, 2008

Charles Norville

**Exhibit 10**

## Sworn Declaration of Loren Person

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Loren Person. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on January 11, 2007 and I was assigned CIMIS number 2007-0002854.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my father Leroy Person, was trying to post bond for me. In the jail, there was no place to sit and I had to stand for about four or five hours. Eventually, I was told that my bond had been posted and was sent to a bullpen where I waited for another four to five hours with approximately 40 other detainees.

Further I state not.

Dated: April _16_, 2008

Loren Person

**Exhibit 11**

## Sworn Declaration of Gregory Rainey

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Gregory Rainey.  I live in Chicago, Illinois.

2. I was processed into the Cook Jail on November 11, 2006 and I was assigned CIMIS number 2006-0087411.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and  I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4.   At the same time that I was being subjected to this treatment, my wife, Daurice T. Rainey, was trying to post bond for me.   It was not until I was in a holding cell awaiting my Division assignment that I was told bond had been posted.

Further I state not.

Dated:  April _16_, 2008

Gregory Rainey

**Exhibit 12**

## Sworn Declaration of Agenol Rodriguez

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Agenol Rodriguez. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on October 9, 2006 and I was assigned CIMIS number 2006-0078323.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, Jimmy Busicos, was trying to post bond for me. It was not until I was awaiting a Division assignment that I was told bond had been posted.

Further I state not.

Dated: April/7, 2008

Agenol Rodriguez

**Exhibit 13**

## Sworn Declaration of John Taylor

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is John Taylor. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on October 31, 2005 and I was assigned CIMIS number 2005-0085590.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my wife Yvanna Smith, was trying to post bond for me. Meanwhile, I was beaten by guards in the holding cells. I was on my way upstairs to my assigned Division when I was told my bond had been posted.

Further I state not.

Dated: April 14, 2008

_John Taylor_

John Taylor

**Exhibit 14**

## Sworn Declaration of Carmen Verlotta

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Carmen Verlotta. I live in Joliet, Illinois.

2. I was processed into the Cook Jail on August 21, 2004 and I was assigned CIMIS number 2004-0067497.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4. At the same time that I was being subjected to this treatment, my room-mate, Scott Edmund, was trying to post bond for me. I was already placed in Division 6 when I was told bond had been posted and was taken to process out. I waited another three to four hours and it was about 2 am before I was finally released.

Further I state not.

Dated: April 2l, 2008

Carmen Verlotta

**Exhibit 15**

## Sworn Declaration of Calvin Walker

The undersigned, under penalties of perjury, certifies that the following statements are true:

1. My name is Calvin Walker. I live in Chicago, Illinois.

2. I was processed into the Cook Jail on October 15, 2006 and I was assigned CIMIS number 2006-0080035.

3. As part of the processing, I was held for several hours in an unsanitary holding cell and I was required to submit to a chest x-ray, the taking of blood, and an embarrassing and humiliating strip search.

4.    At the same time that I was being subjected to this treatment, my brother-in-law, Corwin Bryant, was trying to post bond for me. While I was in the holding cell awaiting release, the guards came in and beat everyone; I myself was slapped in the head and kicked in the buttocks. Once I was told that bond had been posted, I waited in a bullpen another five hours with ten other people before I was actually released.

Further I state not.

Dated:  April 2\, 2008

Calvin Walker

**Exhibit 16**

### Sworn Declaration of Frederick Burton

The undersigned, under penalties of perjury, certifies that the following statements are true:

1.     My name is Frederick Burton.  I live in Oak Park, Illinois

2.     In 1994, I began to work for the Sheriff of Cook County as a correctional officer at the Cook County Jail and I was employed in that capacity in August of 2002.

3.     I was arrested on August 12, 2002 and charged with a felony offense.  This charge was eventually resolved in my favor in a manner consistent with my innocence.

4.     My wife attended my bond hearing, which was conducted in "TV Court" at the Criminal Courts Building at 2600 South California Avenue.

5.     I was released immediately after my bond hearing, when my wife posted cash bond.  I was never taken into the bullpen after the bond hearing, and I was not processed into the jail in any manner.

6.     Based on my work at the jail, I believe that my experience in being permitted to post bond and be immediately released without being processed into the jail is typical for persons of "clout."

Further I state not.

Dated:  April 25, 2008.


_____

Frederick Burton

**Exhibit 17**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KHALIL ABDUR RAHIM,<br>Representative of the Estate<br>of GREGORY MAY, MICHAEL<br>DATES, and WARDELL KYLES,<br><br>        Plaintiffs,<br><br>vs.<br><br>MICHAEL F. SHEAHAN, Sheriff of<br>Cook County, RICHARD REMUS,<br>Superintendent for External Operations,<br>Cook County Department of Corrections,<br>ERNESTO VELASCO, Director, Cook<br>County Department of Corrections,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 99 C 0395<br><br>Magistrate Judge Schenkier |

DOCKETED
OCT 1 9 2001

**REPORT AND RECOMMENDATION**

    This putative class action is brought by former inmates of the Cook County Department of Corrections ("CCDC"): Gregory May (who now is deceased, and whose action is being pursued by his representative, Khalil Abdur Rahim), Michael Dates and Wardell Kyles (neither of whom currently is a prisoner of CCDC).[1]  The defendants are Michael F. Sheahan, the Sheriff of Cook County, Richard Remus, the Superintendent for External Operations, CCDC, and Ernesto Velasco, the Director of CCDC, all of whom are sued in their official and individual capacities.

    The plaintiffs have filed a second amended motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3) (doc. # 76).  This motion has been referred to this Court

---

[1]Mr. May was named as the lead plaintiff or class representative when this case initially was filed on January 22, 1999.  In a Fourth Amended Complaint, filed on July 9, 2001, two more plaintiffs were added as class representatives: Messrs. Dates and Kyles.

for a report and recommendation (doc. # 64).  For the reasons discussed below, the Court recommends that plaintiffs' motion for class certification under Rule 23(b)(3) be granted.

## I.

This lawsuit challenges defendants' alleged policies concerning the treatment of pretrial detainees who are taken to hospitals for medical treatment.  As originally filed, the case involved claims solely by Mr. May concerning his treatment while at Cook County Hospital in January 1999. Mr. May alleged that the Sheriff's Department maintained the following policies which violated his rights:

> One such policy allegedly requires hospital detainees to be shackled, hand and foot, to their beds despite the 24-hour presence of an armed guard.  May claims that as a result of this policy he has been shackled to his bed 24 hours-a-day, which has caused him physical and emotional pain and has impeded his ability to assist in his own defense.  Another policy supposedly provides that hospital detainees will not be taken to assigned court dates and will not be otherwise accommodated (by telephone or video conference, for example).  Pursuant to this policy, May claims that he has been unable to present a motion to reduce his bond or attend any court appearances.  Still other policies allegedly restrict or deny hospital detainees access to their lawyers, visitors, legal materials, telephones, typewriters or computers, books and magazines, and recreational activities.  According to May, because of these policies he has been denied access to his attorney, has been unable to receive visitors, has been prevented from assisting in his own defense, and has had limited or no access to various ordinary amenities of confinement in Cook County Jail.

*May v. Sheahan*, 226 F.3d 876, 878 (7th Cir. 2000).

Based on these alleged policies, Mr. May asserted constitutional violations of equal protection, due process and the First Amendment (by denial of access to the courts), and a statutory violation under the Americans with Disabilities Act ("ADA").   The presiding district judge dismissed the ADA claim against Mr. Sheahan (who at the time was the only named defendant) in his individual capacity on qualified immunity grounds, and in all other respects denied the motion

to dismiss. Mr. Sheahan appealed the denial of qualified immunity on the constitutional claims, and

on review, the Seventh Circuit affirmed the denial of qualified immunity, holding that "the contours

of each of the constitutional rights [Mr. May] asserts was clearly established at the time in question,"

and that as a result, Mr. Sheahan "is not entitled to qualified immunity on the constitutional claims

[Mr.] May asserts." *May*, 226 F.3d at 884.

On remand, the amended complaint has been further amended to add two new plaintiffs

(Messrs. Dates and Kyles).[2] Mr. Kyles alleges that he was arrested on or about November 16, 1998,

and during the course of that arrest he was shot (Fourth Am. Compl., Count V, ¶ 8). As a result of

the bullet wound, he was paralyzed from the neck down (*Id.*, ¶ 9), and he was taken to Mt. Sinai

Hospital, where he was in the custody of defendants and subjected to the same policies alleged by

Mr. May, even though he was paralyzed and in a coma (*Id.*, ¶¶ 10-11). When Mr. Kyles emerged

from his coma and regained some use of his arms, he was transferred from Mt. Sinai to Cook

County Hospital (*Id.*, ¶¶ 12-15). However, even though he had intravenous tubes in one arm and no

movement in his legs, he remained subject to the same policies, including shackling, at all times

(*Id.*). In early December 1998, Mr. Kyles was transferred to Oak Forest Hospital (*Id.*, ¶ 16-18).

While he was there, Mr. Kyles was again subjected to the same policies: he was cuffed by one arm,

had intravenous tubes in the other arm, and had one leg shackled to his bed, even though he had no

movement below the waist (*Id.*, ¶ 18). At all times and in each of the three hospitals where he was

detained, Mr. Kyles alleges that he was subjected to armed guard; his access to his attorney and

---

[2]The current pleading is the Fourth Amended Complaint. During the appeal, Mr. May twice was granted leave by the presiding district judge to amend (the second and third amended complaints). But the Court of Appeals struck those complaints because it found that the appeal had divested the district court of power to grant leave to file the second and third amended complaints. *May*, 226 F.3d at 880.

family was impeded; he was denied the opportunity to prepare his defense; and he was not taken to any scheduled court appearances, which delayed the final disposition of his case and caused him to remain in custody for a longer period of time (*Id.*, Counts VI-VIII).

Mr. Dates was arrested on or about December 15, 1998 (Count IX, ¶ 8). Mr. Dates alleges that his jaw was broken at the time of his arrest, and he therefore was taken to St. Anthony Hospital (*Id.*, ¶ 9). Mr. Dates was detained at St. Anthony Hospital for three to five days; during that time, his jaw was wired shut and he had intravenous tubes in one arm (*Id.*, ¶¶ 10-14). While at St. Anthony Hospital, Mr. Dates alleges that he was subjected to the same policies as Messrs. May and Kyles (*Id.*). In December 1998, Mr. Dates alleges that he was transferred to Cook County Hospital, where he remained for several weeks, during which time he claims that he was subject to the same policies alleged by Messrs. May and Kyles (*Id.*, ¶¶ 15-16; Counts X-XII).

As presently constituted, the Fourth Amended Complaint alleges thirteen counts against Mr. Sheahan and two additional defendants not originally named – Messrs. Remus and Velasco. In Counts I through IV, the May Estate realleges the same violations of his rights under the equal protection clause, the ADA, the due process clause, and – implicitly – the First Amendment (by claiming denial of his right of access to the courts). The only significant change in the allegations concerning Mr. May is to assert that he is deceased and that Mr. Rahim is the representative of his estate. In Counts V through VIII and Counts IX through XII, respectively, Messrs. Kyles and Dates assert these same four causes of action pled by the May Estate. In Count XIII, plaintiffs seek certification as a Rule 23(b)(2) and (b)(3) class based on the discriminatory policies alleged in Counts I and V, and request declaratory, injunctive and monetary relief. During the pendency of this

class certification motion, defendants have answered the Fourth Amended Complaint, and have interposed eight affirmative defenses.

## II.

In their motion for class certification, the plaintiffs argue that all prerequisites for class certification have been met and that certification is proper under Rules 23(b)(2) and (b)(3). The defendants counter that the plaintiffs have failed to meet the commonality and typicality requirements of Rules 23(a)(2) and (a)(3); and that plaintiffs also fail to satisfy the requirements of Rules 23(b)(2) and (b)(3) (Defs.' Resp. at 2-6). Defendants further contend that class certification should be denied due to plaintiffs' failure to exhaust administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and plaintiffs' failure to allege actual physical injury pursuant to the PLRA, 42 U.S.C. § 1997e(e) (Defs.' Resp. at 6-9). In a footnote, the defendants also suggest that plaintiffs do not have standing for injunctive relief because they have no risk of sustaining future injury due to the challenged policies: Mr. May is deceased, and Messrs. Dates and Kyles are no longer "prisoners" (Defs.' Resp. at 7, n.3). Because the standing and PLRA issues are threshold questions, we will address those arguments first.

## III.

The defendant's standing and PLRA arguments must be taken in the context in which they arise: the present motion is limited to the issue of class certification and, indeed, so is our referral. We therefore address the PLRA and the issues of standing only in the certification context (although the same legal principles apply to the issue of dismissal). We will address Article III first, and then take up the issue of the PLRA's exhaustion requirement.

5

### A. Article III.

Article III of the United States Constitution requires a party seeking to invoke the jurisdiction of the federal courts to present an "actual case or controversy." *Perry v. Sheahan,* 222 F.3d 309, 313 (7th Cir. 2001) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983) and affirming dismissal of claims for injunctive relief on grounds that plaintiffs not likely to sustain future injury). Generally, courts have interpreted this provision to mean that the plaintiff must have a "personal stake" in the outcome and/or that "a plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some injury" to have standing under Article III. *Sierkowski v. Ryan,* 223 F.3d 440, 443 (7th Cir. 2000) (listing three general considerations of (a) actual or imminent injury; (b) a causal connection between the injury and challenged conduct; and (c) a likelihood that injury will be redressed by relief sought). *See also Perry,* 222 F.3d at 313.

Defendants argue that none of these plaintiffs satisfy this Article III requirement. Defendants assert that Messrs. Kyles and Dates lack standing because, by the time they filed suit, they were no longer detainees and thus had no appreciable risk of being subject to the policies being challenged. As to Mr. May, defendants argue that his claims have become moot because while he was a detainee when suit was filed, his intervening death has eliminated any cognizable Article III interest in this litigation. This argument ignores two considerations which, in this Court's view, demonstrate that this case meets the requirements of Article III.

*First*, the Article III arguments relied on by defendants do not implicate plaintiffs' claims for monetary relief. The Supreme Court has clearly established a right to recover damages for violations of constitutional rights. In *Carey v. Piphus,* 435 U.S. 247, 254 (1978), the Court stated that "the basic purpose" of damages under 42 U.S.C. § 1983 is "to compensate persons for injuries that are caused

6

by the deprivation of constitutional rights." *See also Memphis Comm. School Dist. v. Stachura*, 477 U.S. 299, 305 (1986). A plaintiff who allegedly suffers a violation of his constitutional rights does not need to show a likelihood of further repetition in order to seek damages for that violation, any more than a person negligently hit needs to show it might happen again to seek damages for that event. Thus, Messrs. Kyles and Dates may press claims for damages for the alleged constitutional violations caused by the challenged policies, irrespective of whether they remain pretrial detainees or whether they are likely to be subjected to alleged policies in the future. The same is true for Mr. May – defendants have offered no reason why his damage claims do not survive his passing.

*Second*, as to the claims for declaratory and injunctive relief, there is no dispute that Mr. May was a detainee at the time of his original suit. As a result, at the outset of this action he had a "personal stake" in a request for equitable relief, because he was at risk of being returned to the hospital and subjected to the alleged constitutional policies. But subject matter jurisdiction must exist not only when the case is filed but when judgment is rendered, *Steffel v. Thompson*, 415 U.S. 452, 460 n.10 (1974), and so post-filing events sometimes can eliminate federal jurisdiction. That is what defendants claim happened here with Mr. May's death.

However, defendants ignore that the loss of a plaintiff's "personal stake" in the outcome of the injunctive case will not affect the class, so long as the class members have a continuing, live controversy which is capable of repetition, but may nonetheless evade review. *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980) ("[w]hen the claim on the merits is capable of repetition, yet evading review, the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation"); *Friends of The Earth v. Laidlaw Environ. Services, Inc.*, 528 U.S. 167, 190 (2000)(same). In *Geraghty*, the Supreme Court cited with approval

7

*Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975), a case which held that the fact that the named plaintiffs no longer were pretrial detainees at the time of class certification did not render moot the claims challenging pretrial detention conditions. The *Gerstein* Court reasoned that the status of detainees may change so quickly as to make it impossible to decide class certification while they were still in custody, and that given the nature of the claims, "the constant existence of a claim of persons suffering the deprivation" would ensure the presence of persons "with a continuing live interest in the case." *Gerstein*, 420 U.S. at 110 n. 11.

This case falls within the *Gerstein/Geraghty* model of a class action alleging violations that are "capable of repetition, yet evading review." Mr. May seeks declaratory and injunctive relief to end policies that allegedly deprive present and future pretrial detainees of their constitutional rights while they are being treated for medical conditions in the hospital. Since enforcement of the defendants' policies is allegedly ongoing, the dispute is capable of repetition. And, since the putative and future class members are unable to seek redress while they are in the hospital and subject to the policy, their claims evade review. Because this policy is capable of repetition but cannot be challenged at the time of the violation, it does not matter if the injunctive action is moot as to Mr. May; it matters only that the action is not moot as to the putative and future class members, and that these members have a "continuing live interest." (*i.e.,* they were or will be subject to the challenged policies, and these policies will be unreviewable if enforced by the defendants again). The Court therefore finds that the Estate of Mr. May retains standing under Article III to seek declaratory and injunctive relief on behalf of himself and the putative class.

The same cannot be said for Messrs. Dates and Kyles. They were not detainees at the time they joined the Fourth Amended Complaint, and thus they do not have a personal stake in the portion

8

of the litigation that seeks declaratory and injunctive relief. *See Friends of the Earth,* 528 U.S. at 190

("if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable

of repetition yet evading review will not entitle the complainant to a federal judicial forum).

### B.  PLRA Exhaustion.

Standing is not the only threshold question the Court must address.  In response to the

plaintiffs' class certification motion, the defendants have raised – for the first time – the issue of

whether the named plaintiffs have exhausted their administrative remedies under the PLRA (Defs.'

Resp. at 6-8).  The plaintiffs, in reply, argue that there is no proof that the PLRA even applies to the

May Estate but, assuming *arguendo* that it does, they claim that this defense has been waived, both

as to the May Estate and the class it represents (Pls.' Reply at 7, 13, 15).  The plaintiffs, however,

do not assume applicability of the PLRA to Messrs. Dates and Kyles, arguing that the PLRA cannot

apply to them because they were not detainees at the time they joined the lawsuit (*i.e.,* filed their

claims).

The PLRA provides, in relevant part, that:

> [n]o action shall be brought with respect to prison conditions . . . by a prisoner
> confined in any jail, prison, or other correctional facility until such administrative
> remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The PLRA defines a "prisoner" as "any person incarcerated or detained in any

facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of

criminal law . . ." 42 U.S.C. § 1997e(h).  The term "prison conditions" has also been held to include

"complaints about medical treatment in prison." *Perez,* 182 F.3d 532, 534 (7th Cir. 1999) (citing

*McCarthy v. Bronson,* 500 U.S. 136 (1991)).  A prisoner's failure to exhaust administrative remedies

before filing a claim constitutes an affirmative defense under Rule 8(c) . . . ." *Massey v. Wheeler,* 196

9

F.3d 727, 735 (7th Cir. 2000)("Massey I").  Because the PLRA's exhaustion requirement is an affirmative defense, defendants have the burden of pleading and proving the defense. *Id.*

We believe the plain language of the PLRA shows that the exhaustion requirement does not apply to Messrs. Kyles and Dates.  The PLRA's exhaustion requirement applies only to one "confined in any jail, prison or other correctional facility."  The Seventh Circuit has held that as used in the PLRA, the term "prisoner" does not "comprehend a felon who has been released." *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998).  In *Kerr*, the Seventh Circuit held that as used in the PLRA, the PLRA physical injury requirement does not apply to one who is not a "prisoner" at the time suit is brought.  We believe this same principle applies to the exhaustion requirement.  Since Messrs. Kyles and Dates were not "prisoners" at the time they joined the Fourth Amended Complaint, the exhaustion requirement of the PLRA does not apply to them and thus presents no impediment to Messrs. Kyles and Dates pursuing this action.

The analysis is more complicated as to the May Estate, because Mr. May was in confinement at the time he filed suit in January 1999.  The fact that he was not in confinement more than two years later, when the Fourth Amended Complaint was filed, is not a basis to avoid the PLRA's exhaustion requirement; the applicability of the PLRA exhaustion requirement is assessed at the time suit is commenced, and not when the complaint might later be amended. *See Perez*, 182 F.3d at 535 (stating that "no action may be *commenced*" and "no action shall be brought" without satisfying the exhaustion requirement) (emphasis added); *see also Kerr*, 138 F.3d at 323 (recognizing that the "court must determine the prisoner's status on the date the suit or appeal is 'brought' rather than at some other time").  However, for the reasons that follow, the Court holds that the PLRA does not bar the May Estate from pursuing this action.

10

1. Waiver.

The Seventh Circuit has recognized that a defendant "may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations." *Perez*, 182 F.3d at 536. Like a statute of limitations, the PLRA exhaustion requirement is a non-jurisdictional prerequisite to suit that can be waived where the defendants do not raise the defense in a timely manner. *See Gibson v. West*, 201 F.3d 990, 993 (7th Cir. 2000); *Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) ("normally the failure to plead a defense in a timely fashion is a waiver"). In this case, the Court believes that a strong case is to be made that defendants have waived their PLRA exhaustion defense as to the May Estate.

In response to Mr. May's original complaint, the defendants filed a motion to dismiss on the grounds of qualified immunity, which was denied by the district court – a denial later affirmed by the Seventh Circuit. *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). While the motion to dismiss was pending in the district court, Mr. May filed an amended complaint, which Mr. Sheahan answered (doc. # 20). Neither on the motion to dismiss nor in the answer did Mr. Sheahan assert failure to exhaust as a bar to Mr. May's suit.

The defendants did not raise the PLRA exhaustion issue until their response to the motion for class certification, which they filed on August 22, 2001: more than two and one-half years after this case commenced. During that extended period, the parties have engaged in discovery, and have litigated a motion to dismiss both in the district court and in the Seventh Circuit. Defendants have offered no explanation for failing to raise this defense earlier, even though the answer to the amended complaint filed in 1999 raised other affirmative defenses. And, given the frequency with which defendants assert the PLRA exhaustion defense in prisoner litigation, the Court will not

11

assume that the defendants' failure to do so here was mere oversight as opposed to a strategic decision (such as, a desire to obtain a judicial determination that the challenged policies are constitutional or, if not, at least does not involve "clearly established" rights and thus fall within the protection of qualified immunity). Having obtained district court and Seventh Circuit opinions on those subjects that are not to their liking, we do not believe that defendants should be entitled now to assert a defense that they could have raised long ago.

We are mindful that plaintiffs have filed a Fourth Amended Complaint, and that the filing of a new complaint typically "wipes away prior pleadings" and thus "opens the door for defendants to raise new and previously unmentioned affirmative defenses." *Massey I*, 196 F.3d at 735. But that principle is inapplicable here, because even though defendants argue the exhaustion requirement in their opposition to class certification, they do not plead that affirmative defense in their answer to the Fourth Amended Complaint, even though they assert eight other affirmative defenses. As with the failure to raise this affirmative defense in the original answer, we conclude that defendants' failure to raise it in their answer to the Fourth Amended Complaint cannot be chalked up to inadvertence – a conclusion which we believe is further supported by the fact that defendants filed this answer on October 16, 2001, during the pendency of this class certification motion. Thus, we believe that the defendants have waived any exhaustion defense they otherwise might have had in this case.[3]

---

[3]In the event that defendants seek leave to amend their answer to raise that affirmative defense, we would recommend that the district judge deny such a request. Any effort at this late date to assert the defense would be the product of undue delay, as there is no good reason the defense could not have been raised earlier. Moreover, that delay resulted in two types of prejudice. Allowing the belated assertion of the defense plainly would prejudice the May Estate – Mr. May is now deceased and thus cannot exhaust any available grievance procedure and refile his claim, as he might have done had the affirmative defense been timely asserted. Defendants' conduct also would cause prejudice to the judicial system. If the exhaustion argument were meritorious, then defendants would needlessly have caused the two courts to address the qualified immunity defenses on the constitutional claims, without first exploring the exhaustion

2. Vicarious Waiver as to Class.

Having found that the defendants waived the PLRA defense as to the May Estate, the question still remains (although the parties do not raise or brief it for us) whether the defense can be vicariously waived as to the putative and future class members that the May Estate seeks to represent. Although the parties have not provided us with any cases directly addressing this issue, and we have not found any, the Court thinks there are grounds for finding vicarious waiver of the PLRA defense as to the class.

There are strong analytical analogies between a vicarious waiver of the PLRA's exhaustion requirement and the doctrine of "vicarious exhaustion of administrative remedies" which has been recognized in the Title VII context. *See Hartman v. Duffey,* 88 F.3d 1232, 1235 (D.C. Cir. 1996) (doctrine of "vicarious exhaustion of administrative remedies" applies when one member of a class satisfies the exhaustion requirement for all others with sufficiently similar grievances). The Court believes that the doctrine of vicarious exhaustion should apply to claims of waiver, creating a "vicarious waiver" of the exhaustion requirement in the class certification context. The vicarious

---

requirement.

Moreover, we note that even if defendants were allowed to belatedly raise the defense, in the Court's view it would not affect the class certification question. *First,* even if raised now, the exhaustion requirement could not be addressed on a motion to dismiss. Federal Rule of Civil Procedure 12(g) prevents a party who has made a motion to dismiss without raising an available defense to assert that defense in a subsequent motion to dismiss. *Second,* while defendants argue that Mr. May did not exhaust prison grievance procedures, they have offered no evidence of the existence of such a procedure or, if one exists, that this procedure is capable of providing some relief in response to a complaint about the conditions of hospitalization challenged here. The availability and efficacy of a grievance procedure are part of defendants' affirmative defense under Section 1997e(a), which they have the burden of proving. And, while a plaintiff may not forego the process merely because it does not provide his preferred relief, *see Booth v. Churner,* 121 S. Ct. 1819, 1825 (2001), by the same token a plaintiff need not resort to an administrative procedure that "lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth,* 121 S. Ct. at 1822 and n.4; *see also Larkin,* 2001 WL 1117476, at *3; *Perez,* 182 F.3d at 538. Thus, even if the exhaustion defense were available to defendants on Mr. May's claim, they would have the burden of proving that there is an administrative process that would be able to take action in response to complaints about the challenged conditions of hospitalization – action, that is, other than saying, "Sorry, we can't do anything about it."

exhaustion theory has been applied in the Title VII context to class claims where the named plaintiff has satisfied the administrative exhaustion prerequisites of that statute. *Duffey,* 88 F.3d at 1235 (citing *Foster v. Gueory,* 655 F.2d 1319, 1322-23 (D.C. Cir. 1981)). In those cases, courts have held that there is no need for every member of the putative (or future) class to individually exhaust their remedies where the claims of each class member otherwise meet the requirements of Rule 23, since it was reasonable to presume that the results encountered by the class representative at the administrative level would be the same results attendant to class members with similar claims. The Court sees no reason in this case why this analysis should not apply equally to claims under the PLRA. *See generally Doe v. Cook County,* No. 99 C 3945, 1999 WL 1069244, * 3, n.5 (N.D. Ill., Nov. 22, 1999) (raising question whether doctrine of vicarious exhaustion viable in PLRA context under *Duffey*).

Taking the next step, we also believe that there is no reason why this doctrine should not apply where the "exhaustion" has occurred by the defendants waiving the requirement. If the named plaintiff may proceed as the class representative in that status, why then should the class he represents not also proceed without exhaustion? It is certainly the case under *Duffey* that the individual class members do not need to exhaust when the class representative has exhausted; and under the same rationale, it makes sense to hold that a waiver of the PLRA exhaustion requirement as to the class representative is a waiver as to all putative class members.

This theory finds support in *Duffey,* albeit in a different procedural context. There, the court of appeals found that certain class members could intervene without having individually exhausted their administrative remedies, not only under the theory of vicarious exhaustion, but also because the defendants had failed to raise the exhaustion defense in a previous appeal. The court therefore

14

found that the exhaustion defense had been waived, in part because it came too late in the day (wasting judicial resources in its wake). The court noted that "[b]y arguing the exhaustion point at the appropriate (much earlier) juncture, the [defendant] could perhaps have undone certification at one stroke." 88 F.3d at 1236.

Based in the foregoing analysis, we recommend that the PLRA defense be deemed waived not only as to the May Estate but also as to the class members he represents.

### 3. The Physical Injury Requirement.

The defendants also argue that Section 1997e(e) of the PLRA "prohibits prisoners from filing suit for any alleged mental or emotional injury without a prior showing of a physical injury" (Defs.' Resp. at 8). Section 1997e(e) of the PLRA provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e) (2001). The defendants correctly point out that under Section 1997e(e), prisoners who do not claim physical injury cannot recover alleged damages for mental or emotional injury. *Zehner v. Trigg*, 133 F.3d 459, 461 (7th Cir. 1997). But this requirement presents no bar to class certification for three reasons.

*First*, the Supreme Court has clearly established that "[t]he prohibitive feature of Section 1997e(e), requiring physical injury before recovery, does not apply in the context of requests for declaratory or injunctive relief sought to end an allegedly unconstitutional condition of confinement." *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (citing *Helling v. McKineey*, 509 U.S. 25, 34 (1993)). Thus, under no circumstances would Section 1997e(e) bar certification of a class for declaratory and injunctive relief.

*Second*, controlling case law holds that this physical injury requirement does not apply to Messrs. Dates and Kyles, who were not prisoners when they filed suit. *See Kerr*, 138 F.3d at 322-23; *see also Harris v. Garner*, 216 F.3d 970, 973 (11th Cir. 2000). Thus, under no circumstances would Section 1997e(e) bar Messrs. Dates and Kyles from proceeding in this case or from representing a class seeking damages.

*Third*, the Fourth Amended Complaint in fact alleges that each named plaintiff suffered "physical injury." For example, the May Estate claims that the challenged practices impeded Mr. May's "*physical* and emotional recovery," and caused him to "suffer[] prolonged and unnecessary *physical pain* and emotional turmoil (Fourth Am. Compl., Count III, ¶ 33) (emphasis added). The PLRA does not define "physical injury." In the absence of a governing Seventh Circuit authority, we follow the approach in *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999), and apply the physical injury standard used in excessive force cases: the injury "must be more than *de minimis*, but need not be significant." *Id.*, quoting *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)). At the pleading stage, plaintiffs' allegations are enough to meet the requirement of Section 1997e(e).

## IV.

To certify a class under Rule 23, a plaintiff must satisfy all four elements of Rule 23(a). If each of those elements are satisfied, then the plaintiff must satisfy one of Rule 23(b)'s requirements. *See Jefferson v. Security Pacific Financial Services*, 161 F.R.D. 63, 67 (N.D. Ill.1995); *Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302, 306 (N.D. Ill. 1995). A party seeking class certification bears the burden of proving that each of these requirements under Rule 23 has been met. *General Telephone Co. v. Falcon*, 457 U.S. 147, 162 (1982). Failure by the plaintiff to satisfy any

one of these prerequisite elements precludes certification. *Retired Chicago Police Assoc. v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). However, if the plaintiff seeking certification satisfies the burden of showing that the certification requirements are satisfied, then the court must certify the proposed class. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). "The court maintains broad discretion to determine whether a proposed class satisfies the requirements and should err in favor of maintaining class actions." *Guillory v. The American Tobacco Co.,* No. 97 C 8641, 2001 WL 290603, * 2 (N.D. Ill. March 20, 2001) (citing *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir. 1980)).

To determine whether the requirements of Rule 23(a) and (b) have been satisfied, the Court must examine the factual basis for a plaintiff's claims. When making that factual inquiry, the Court must reconcile two lines of authority that, while perhaps facially at odds, are indeed in harmony.

The Supreme Court has made it clear that the propriety of class certification is a separate issue from whether the plaintiff will ultimately prevail on the merits of certain claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974) ("nothing in either the language or the history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"). A meritorious claim may be denied class certification if it does not satisfy Rule 23; and, conversely, non-meritorious claims may be resolved adversely to the plaintiffs after a court certifies a Rule 23 class, resulting in a *res judicata* effect on the class. *See Cowen v. Bank United of Texas, FSB,* 70 F.3d 937, 941-42 (7th Cir. 1995). Thus, while the "boundary between a class determination and the merits may not always be easily discernible," *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 599 (7th Cir. 1993), because the Court's certification decision depends on factors "'enmeshed in the factual and legal

17

issues comprising the plaintiff's cause of action." *id.* at 598, it nonetheless is a boundary that must be respected.

At the same time, the Seventh Circuit recently has commented that unlike a motion to dismiss, where a plaintiff's factual allegations are accepted, "the proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). The Seventh Circuit explained, for example, that a court would not be free to accept an allegation of 10,000 class members for purposes of numerosity, in the face of a dispute on that point. *Id.*, at 676. The appeals court also explained that where the question of suitability for class treatment overlaps with a question related to the merits, the district judge "must make a preliminary inquiry into the merits." *Id.*

We do not believe that *Szabo* directs district courts to decide class certification questions based on a preliminary assessment of the ultimate merits of the plaintiffs' claims: to base class certification on a prediction of who will win the case would be at odds with *Eisen*. In our view, the "preliminary inquiry into the merits" discussed in *Szabo* is a more limited one, that has at its focus not the substantive strength or weakness of the plaintiffs' claims but rather the merits of those allegations that bear on the suitability of a case for class treatment under Rule 23(a) and (b). It is in this limited sense that the Court assesses the "merits" of plaintiffs' allegations in considering the class certification motion.

18

## A.

"There are two implied prerequisites to class certification that must be satisfied prior to addressing the issues raised by Rule 23(a). *First*, the class must be sufficiently defined so that the class is identifiable." *Guillory*, 2001 WL 290603, at * 2 (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)). *Second*, "the named representatives must fall within the proposed class." *Id.*

### 1. Class Definition.

"A class must be clearly defined so that a Court can determine whether a particular individual is a member of the proposed class." *Gillory*, 2001 WL 290603, at * 2 (citing *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999)). "Whether the description of a class is sufficiently definite to permit ascertainment of the class members must be determined on a case-by-case basis." *Alliance to End Repression*, 565 F.2d at 977. "However, the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf." *Id.* (citing *Clay*, 188 F.R.D. at 490).

Plaintiffs seek to certify a class on behalf of :

> all Cook County Jail inmates who are, were or will be transferred from the jail to an outside hospital and who are subject to defendant Sheahan's policies regarding hospitalized detainees (*e.g.*, shackling prisoners to bed all day, every day, not allowing prisoners to make phone calls or write letters or have access to family members or attorneys; and in most cases, preventing such prisoners from attending court hearings).

(Pls.' Mem. at 2-5). The plaintiffs argue that this proposed class definition is "sufficiently precise" (Pls.' Mem. at 5-6). Although the defendants do not make any direct arguments that the proposed definition is too broad, they do argue generally that "[w]hile the plaintiffs allege that all potential

claimants are, were or will be transferred to outside hospitals, they fail to consider the varying circumstances under which the individuals are being detained" (Defs.' Mem. at 3). In essence, the defendants make the argument that the proposed definition is too broad because it does not make any distinctions between members of the class based on individual histories of criminal or violent activity, and the potential need to shackle and implement other security measures.

The problem with defendants' argument is that their argument rests on distinctions that, based on plaintiffs' allegations, defendants do not make when implementing their policies. Defendants offer no evidence to contradict plaintiffs' assertion that the policies are applied without regard to the individual criminal history or security needs of each hospitalized prisoner. In fact, Mr. Remus's testimony is that the policies are the same for all hospitalized inmates *without regard to* their individual criminal history or the state's security needs (Pls.' Ex. 2 (Remus Dep. at 5-12, 38-42)). We agree with plaintiffs' argument that defendants' "policies define the class, determine the size of the class, limit the relevant issues of law, and control the operative facts" (Pls.' Reply Mem. at 5). The Court finds that the proposed definition is not too broad given the defendants' alleged choice to implement the policy on a broad basis, without any distinctions made between detainees on the bases defendants now assert are necessary.

However, the proposed class is too broad in a way that defendants do not raise: it would include persons who were subjected to the alleged policies more than two years prior to the filing of this suit. Such a class would conflict with the two-year statute of limitations that governs claims under 42 U.S.C. § 1983 in this Court. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985) (holding that Section 1983 actions are "best characterized as personal injury actions," and thus are governed by applicable state statutes of limitations for such actions); *Pitts v. City of Kankakee*, ___ F.3d ___,

20

2001 WL 1117290, * 4 (7th Cir., Sept. 24, 2001) (Section 1983 actions in Illinois are governed by a two-year statute of limitations). Thus, the class period may not reach back earlier than January 22, 1997 – two years before Mr. May filed this suit.[4]

### 2. Named Representatives.

The Court finds that the named plaintiffs fall within the definition of the proposed class. Each plaintiff named in the Fourth Amended Complaint was incarcerated by CCDC at the time they were admitted to the hospital and subjected to the defendants' alleged policies. With these requirements satisfied, we now turn to the prerequisites of Rule 23(a).

### B.

Rule 23(a) requires a plaintiff to establish four elements: numerosity, commonality, typicality and adequacy of representation. Failure to meet any of these four requirements will preclude certification of the class. *Retired Chicago Police Association v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). If these prerequisites are satisfied, then the court must determine whether one of the standards of Rule – Rule 23(b)(2) and/or (3) – is met. All four of these prerequisites for class certification under Rule 23(a) have been met in this case, as have the requirements of Rule 23(b)(2) and (b)(3).

### 1. Numerosity.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). While there is no "bright line" test for numerosity, courts

---

[4]Although not raised by defendants, we do not believe that the request to include in the class future detainees who are subjected to the alleged policies renders the proposed class unmanageable. It is permissible to encompass future members in a class definition, even though the number of future detainees subject to the challenged policy is not certain given that sickness and injury is a variable occurrence. *Hodges v. Public Building Comm'n.*, No. 93 C 4328, 1994 WL 603105, * 1 (N.D. Ill., Oct. 31, 1994).

have found this element satisfied where the putative class would number in the range of as few as 10 to 40. *See, e.g., Swanson v. American Consumer Industries,* 415 F.2d 1326, 1333 (7th Cir.1969) (40 sufficient); *Riordon v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill.1986) (10-29 sufficient). In making the numerosity determination, "the court is entitled to make common sense assumptions." *Keele v. Wexler,* 1996 WL 124452, * 3 (N.D. Ill.), *aff'd,* 149 F.3d 589 (7th Cir.1997); *see also Patrykus v. Gomilla,* 121 F.R.D. 357, 360 (N.D. Ill. 1988). Although "the one who asserts the class must show some evidence or reasonable estimate of the number of class members [,] if a plaintiff cannot provide precise numbers, 'a good faith estimate is sufficient [to satisfy the numerosity requirement] where it is difficult to assess the exact class membership.'" *Long v. Thornton Township High Sch. Dist., 205,* 82 F.R.D.186, 189 (N.D. Ill. 1979). In this case, plaintiffs' uncontradicted assertion that "the alleged class exceeds one thousand" is sufficient to satisfy this requirement (Pls.' Motion ¶ 8).

### 2. Commonality and Predominance.

Rule 23(a)(2) requires the presence of questions of law or fact common to the class. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). If the commonality requirement of Rule 23(a)(2) is satisfied, the Court must then turn to Rule 23(b)(3) and determine whether the common questions of fact or law "predominate" over issues affecting individual members. Although the commonality and predominance requirements are separate hurdles that a party seeking to certify a class must overcome, analysis of one element often will dispose of issues common to both requirements. Thus, it is appropriate to analyze the commonality and predominance elements together. *See, e.g., Hoffman v. Grossinger Motor Corp.,* No. 96 C 5362, 1999 WL 184179, * 3 (N.D.

Ill., March 29, 1999); *Peterson v. H & R Block Tax Servs., Inc.,* 174 F.R.D. 78, 82 (N.D. Ill.1997); *Miller v. Wexler & Wexler,* No. 97 C 6593, 1998 WL 60798, at *5 (N.D. Ill., Feb. 6, 1998).

Under Rule 23(a)(2), "questions of law or fact common to the class" must exist before a class may be certified. A plaintiff may ordinarily satisfy the commonality requirement by showing that there is "at least one question of law or fact common to the class." *Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659, 663 (N.D. Ill.1996) (citations omitted). Class certification will not be defeated solely because there are some factual variations among the grievances of the class members. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998); *Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.1980). Perhaps more importantly here, when a "question of law refers to standardized conduct by defendants toward members of the class, a common nucleus of operative facts is typically presented, and the commonality requirement is usually met." *Von Moore v. Simpson,* No. 96 C 2971, 1997 WL 570769, at *3 (N.D. Ill., Sept. 10, 1997) (internal quotations omitted); *Keele v. Wexler,* No. 95 C 3483, 1996 WL 124452 at *4 (N.D. Ill., March 19, 1996), *aff'd,* 149 F.3d 589 (7th Cir.1998); *Franklin,* 102 F.R.D. 944, 949 (N.D. Ill. 1984) (citing *Katz v. Carte Blanche Corp.,* 52 F.R.D. 510, 514 (W.D.Pa.1971)) (finding class certification appropriate where plaintiff challenged city police department's standard method of transporting all arrestees); *Heartland Communications, Inc. v. Sprint Corp.,* 161 F.R.D. 111 (D.Kan. 1995) (granting class certification where the contracts signed by all proposed class members, while not identical, contained virtually the same provision as that challenged by the named class representative); *In re United Energy Corp. v. Solar Power Modules Tax Shelter Invs.,* 122 F.R.D. 251 (D.Cal.1988) (finding class certification appropriate where the class claims were primarily grounded on misrepresentations and omissions contained in a common core of documents); *Lessard*

23

*v. Metropolitan Life Insur. Co.,* 103 F.R.D. 608 (D.Maine 1984) (granting class certification where all proposed class members were parties to the same contract and subject to the same standardized conduct by the defendant).

The plaintiffs here have alleged that the defendants' policies are applied uniformly to all prisoners who are hospitalized (*e.g.,* shackling by hand and foot, all day, even when using the restroom; no access to legal information; no transportation to scheduled court appearances; no access to attorneys; and no access to telephone (unless a case worker places a call for the prisoner); and severely restricting visiting privileges). The application of those policies is common to all class members. The defendants do not offer evidence to challenge this allegation. In fact, Mr. Remus essentially admits that, with one minor exception (the defendants permit court visits for prisoners at the Oak Forest Hospital), the alleged policies are the same for all hospitalized inmates (Pls.' App. 2, at 5-12, 12-18, 30-36 38-42).

Instead, the defendants argue that the Court's focus should not be on the standardized conduct related to *application* of the policies, but rather on the individualized nature of the injuries and damages flowing from these policies (Defs.' Mem. at 4). However, Rule 23(a)(2) does not require that the claims be identical, only that they arise from a standardized course of conduct or that they arise from substantially the same legal theories. *Chandler v. Southwest Jeep-Eagle,* 162 F.R.D. 302, 308 (N.D. Ill. 1995); *Johns v. DeLeonardis,* 145 F.R.D. 480, 483 (N.D. Ill. 1991). The plaintiffs' allegations of standardized conduct, together with Mr. Remus's testimony, is sufficient to satisfy Rule 23(a)(2)'s commonality requirement. We also find the predominance requirement of Rule 23(b)(3) satisfied by the allegations of standardized conduct, at least for purposes of liability.

24

As for any individual damages issues that may exist after further discovery, they can be addressed through the creation of subclasses under Rules 23(b)(3) and 23(c)(4)(B).[5]

### 3. Typicality.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp. Inc.,* 713 F.2d 225, 232 (7th Cir. 1983) (internal quotations omitted). Therefore, the typicality prong "may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of the other class members." *Id.* The key to typicality is based on the relationship between the class representative and the class members: are the named plaintiff's interests aligned with those of the proposed class in such a way that the representative, in pursuing his own claims, will also advance the interest of the class. *Guillory v. The American Tobacco Co.,* No. 97 C 8641, 2001 WL 290603, 3 (N.D. Ill., March 20, 2001) (citing *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir. 1996)).

In this case, the defendants contend that plaintiffs' claim of typicality is defeated by "the variety of circumstances under which the putative members are allegedly being injured." These varied circumstances, according to defendants, mean that "the three named plaintiffs cannot

---

[5]Many courts have recognized that where the liability issues involve standardized conduct that "predominates over any questions affecting only individual members" any individual issues related to damages can be adequately dealt with under Rule 23(b)(3) through the use of subclasses, as authorized by Rule 23(c)(4)(B). *BJustrom v. Trust One Mortgage Co.,* 199 F.R.D. 346, 351 (W.D. Wash. 2001). It is not the Court's obligation to create such subclasses *sua sponte. Geraghty,* 445 U.S. at 407-08. Rather, that the Supreme Court has clearly held that the plaintiff has the opportunity and burden of proposing and constructing subclasses that will make the disposition of any individual damages "fair and efficient" under Rule 23(b)(3). *Id.* at 407.

adequately represent the interests of the purported class members" (Defs.' Resp. at 4). This is a rehash of the same argument we rejected under Rule 23(a)(2), and we reject it under Rule 23(a)(3) for the same reasons.

The named plaintiffs' claims are typical of those of the putative class members because the same set of policies and practices are allegedly applied to both the named plaintiffs and the proposed class members in the same way – regardless of individual criminal history or other considerations. In other words, both the named plaintiffs and the class they seek to represent were subjected to the "same event or practice or course of conduct" by the defendants. In general, the facts necessary to satisfy the commonality and typicality requirements are "closely related." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). This is certainly true in this case, and this similarity "compels a finding" that both requirements have been met. *Buycks-Roberson v. Citibank Fed. Savings Bank,* 162 F.R.D. 322, 333 n.13 (N.D. Ill. 1995). Thus, we find the typicality requirement satisfied, with the same caveat noted for commonality – namely, that subclasses may need to be created for purposes of a monetary damages phase.

4. Adequacy of Representation.

To be an adequate representative, a plaintiff must have a sufficient stake in the outcome to ensure zealous advocacy, and must not have antagonistic or conflicting claims with other class members; moreover, counsel for the named plaintiff must be experienced, qualified, and generally able to conduct the litigation. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir. 1993). The class representative must also have the same interest as the other class members in establishing the claims alleged against the defendant in the case. *Hoffman,* 1999 WL 184179, at * 5.

The defendants do not challenge the adequacy of the named plaintiffs or their counsel. Although the issues of standing, exhaustion and the injury requirement under the PLRA are arguably issues related to the named plaintiffs' adequacy to represent a class, the defendants have not linked these issues to the adequacy of the named plaintiffs as class representatives. In any event, for the reasons outlined in the preceding sections, the Court finds the named plaintiffs may represent a Rule 23(b)(2) and a (b)(3) class.

C.  Rules 23(b)(2) and (b)(3).

Having satisfied Rule 23(a), the next question is whether plaintiffs have met the requirements of Rules 23(b)(2) and (b)(3).  Rule 23(b)(2) permits certification of a class if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Rule 23(b)(2) is generally "invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought." *Buycks-Roberson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 322, 335 (N.D. Ill. 1995).  A court considering Rule 23(b)(2) certification must find that the injunctive or declaratory relief is "primary" or "exclusive," because Rule 23(b)(2) certification creates "binding litigation on all class members without guarantees of personal notice and the opportunity to opt out of the suit." *Lemon v. International Union of Operating Engineers, Local No. 130,* 216 F.3d 577, 580 (7th Cir. 2000).

> This non opt-out restriction is imposed on the
>
> presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among the class members. A suit for money damages, even if the plaintiffs seek uniform, class wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because

27

> individual claims for compensatory or punitive damages typically require judicial
> inquiry into the particularized merits of each individual's claim.

*Lemon,* 216 F.3d at 280.  Thus, class certification of claims seeking monetary relief is not

appropriate under Rule 23(b)(2) unless the demand is incidental to the request for equitable relief.

*Lemon,* 216 F.3d at 580-81 (adopting Fifth Circuit's definition of "incidental" as "damages that flow

directly from liability to the class as a whole on the claims forming the basis of the injunctive or

declaratory relief" or damage claims that do not depend "in any significant way on the intangible,

subjective differences of each class member's circumstances" and do not "require additional hearings

to resolve the disparate merits of each individual's case").

   That is not our case.  Here, for the reasons explained above, Messrs. Dates and Kyles cannot

prosecute a claim under Rule 23(b)(2) for declaratory or injunctive relief since they were not

prisoners when they joined this suit.  Moreover, the damage claims of the May Estate, while not

predominant, cannot be said to be merely incidental to the Estate's claims (or the claims of the class

it seeks to represent) for injunctive and declaratory relief.  We expect that the compensatory damage

claims of individual class members may require individual determinations, since any harm caused

by defendants' alleged policies likely would fall more heavily on some plaintiffs than on others.

   Thus, despite the defined set of standardized policies that the defendants admittedly enforce

against all hospitalized prisoners, the non-incidental nature of the damage claims makes this case

a difficult fit for class certification under Rule 23(b)(2).  One way that Rule 23(b)(2) could be used

here is if the Court were to require personal notice and an opportunity to opt out for all putative class

members (thereby satisfying due process concerns), pursuant to Rule 23(d)(2) and (d)(5), "as though

the class was certified under Rule 23(b)(3)." *Lemon,* 216 F.3d at 580.  Although the Seventh Circuit

28

has recognized a Rule 23(b)(2) "opt out" class as a valid method for certifying classes in cases like ours, this Court recommends that the district court "opt" for certification under Rule 23(b)(3) instead.[6] Here is why.

Rule 23(b)(3) permits class certification when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This rule requires two findings: predominance of common questions over individual ones and superiority of the class action mechanism.

The Court has already found that the predominance requirement has been satisfied by the standardized policies allegedly enforced against the named plaintiffs and putative class members alike. On the issue of whether a class action is superior to other available methods of adjudication, the Court considers the following factors, as required by Rule 23(b)(3): (a) the interest of the members in the class individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims

---

[6]In *Lemon,* the Seventh Circuit outlined "three alternatives" for handling a case where there is a standardized policy being challenged and injunctive and/or declaratory relief is sought, but where there are also claims for monetary damages that are not incidental to the requested equitable relief. The first option is certification under Rule 23(b)(3) for both the equitable and damages claims with mandatory notice and opt-out for all class members. A second option is certification under Rule 23(b)(2) with personal notice and an opportunity to opt-out for all class members. As explained more fully above, this Court chooses the first option because it is both the most simple and the most compatible with the facts of this case.

A third option is "divided certification," which establishes a Rule 23(b)(2) class for injunctive and declaratory relief only (without notice and opt-out requirements), and a Rule 23(b)(3) class for damages only. The Court does not recommend the "divided certification" approach because here we do not have separately defined classes to certify for purposes of equitable versus monetary relief – one reason (and perhaps the only one) we can see for adopting that divided approach.

in a particular forum; and (d) the difficulties likely to be encountered in the management of a class action.

In this case, each of those factors support certification.  The damage claims are likely to be individually small; thus, providing one action in which they all may be addressed advances an underlying purpose of the class action vehicle.  Given that the predominant focus of this case involves injunctive and declaratory relief for a standardized policy and/or practice, certification of a class action provides the most fair and efficient way to adjudicate numerous individual claims that could be filed seeking the same relief.  Any difficulties of managing this case on a class basis are likely to be encountered (if at all) on the damages side, and can be adequately addressed through the use of subclasses under Rule 23(c)(4)(B), or bifurcation under Rule 23(d)(2).[7]

---

[7]While individual determinations may be needed for actual damages, that may not be the case as to punitive damages.  While the issue of punitive damages normally requires individual determinations related to the facts of plaintiff's individual circumstances and whether "the defendant possessed a reckless indifference to the plaintiff's federal rights," *Lemon*, 216 F.3d at 581 (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999)), the Court can envision class treatment of such a claim where – as here – the policy at issue allegedly is applied without regard to individual circumstances and in a broad-based, systematic way.  In analogous situations, courts have certified classes for purposes of litigating punitive damages.  *See, e.g., In re Fibreboard*, 893 F.2d 706, 708, 712 (5th Cir. 1990) (upholding certification under Rule 23(b)(3) of a class in asbestos litigation for determination of certain liability issues and punitive damages); *see also In Re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718, 728 (E.D.N.Y. 1983) (certified class for punitive damages under Rule 23(b)(1)(B)).

The Court is mindful that the Seventh Circuit has held that "the right to punitive damages is a right of the individual plaintiff, rather than a collective entitlement of the victims of the defendant's misconduct," a proposition that the appeals court drew from the rule that a "plaintiff's award of punitive damages is not limited by awards made to previous plaintiffs complaining of the same act of the defendant." *In Re Brand Name Prescription Drugs*, 123 F.3d 599, 608-09 (7th Cir. 1997).  However, the Seventh Circuit acknowledged that this rule "may have to be qualified" in light of the Supreme Court's decision in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, (1996), which held that excessive punitive damages awards violate due process.  123 F.3d at 609.  The Seventh Circuit reasoned that "a piling on of awards by different courts for the same act might result in excessive punishment for that act." *Id.*

The same reasoning would apply to the seriatim punitive damages awards by the same court in individual damages hearings in a class action.  To the extent that due process places a limit on the amount of punitive damages that can be awarded against a defendant in a class action, fairness would suggest that all class members affected by the conduct share in that amount equitably rather than have the identity of those class members who might receive punitive damages turn on the fortuity of whose hearings proceeded first (before the due process limit is reached).  Rule 23(b)(1)(B) seems suited to avoiding this latter result, as it authorizes certification to avoid a risk of "adjudicating as with respect to individual members of the class which would as a practical mater be dispositive of the interests of the other

In light of these considerations, the Court believes a Rule 23(b)(3) class is an appropriate vehicle for litigating the claims in this case. Having so found, we see no reason to reconfigure Rule 23(b)(2) to provide for the notice and opt-out right that will be provided anyway under Rule 23(b)(3).

## CONCLUSION

This Court therefore respectfully recommends that the district court grant the plaintiffs' second amended motion for class certification (doc. # 76) and certify following proposed class under Rule 23(b)(3) for liability and damages:

> all Cook County Jail inmates who, on or after January 22, 1997, were or are subject to defendants' alleged policies regarding hospitalized detainees (*e.g.,* shackling prisoners to bed all day, every day, not allowing prisoners to make phone calls or write letters or have access to family members or attorneys; and in most cases, preventing such prisoners from attending court hearings).[8]

As part of this recommendation, the Court specifically recommends that the district court find that: (1) plaintiff May has standing to bring his liability claims for injunctive, declaratory and monetary relief and to represent a class under Rule (b)(3); (2) plaintiffs Dates and Kyles have standing to bring liability claims for monetary relief only under Rule 23(b)(3); and (3) the defendants have waived their PLRA affirmative defenses as to the May Estate, and that these defenses do not apply to plaintiffs Dates and Kyles, who were not prisoners at the time they filed their claims.

---

members not parties to the adjudication or substantially impair or impede their ability to protect their interests."

By these comments, we intend no view on whether punitive damages would or should be awarded in this case. We intend only to point out that this issue, if appropriate for submission to a jury, might be suitable for class treatment.

[8]This formulation of the proposed class modifies the definition sought by plaintiffs so as to exclude persons who were subjected to the alleged policies more than two years prior to the filing of this suit, as the claims of any such persons would be barred by the two-year statute of limitations applicable in Section 1983 cases.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: October 18, 2001

# CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of April, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Maureen O. Hannon, Ass't State's Atty, 500 Richard J. Daley Center, Chicago, Illinois 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.

/s/ Kenneth N. Flaxman
_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)